1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

John J. Nelson (SBN 317598)
*jnelson@milberg.com*
**MILBERG COLEMAN BRYSON**
**PHILLIPS GROSSMAN, PLLC**
402 W. Broadway, Suite 1760
San Diego, CA 92101
Telephone: (858) 209-6941

Theodore W. Maya (SBN 223242)
*tmaya@ahdootwolfson.com*
Alyssa Brown (SBN 301313)
*abrown@ahdootwolfson.com*
**AHDOOT & WOLFSON, PC**
2600 W. Olive Ave. Suite 500
Burbank, CA 91505
Telephone: (310) 474-9111

*Counsel for Plaintiffs and the Proposed Class*

[Additional counsel listed on the signature page]

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| *IN RE: CROSSROADS TRADING, INC. DATA BREACH LITIGATION*<br><br>This Documents Relates To: All Actions | Lead Case No.: 3:25-cv-03128-AGT<br><br>**CONSOLIDATED CLASS ACTION COMPLAINT**<br><br>1. **Negligence and Negligence Per Se**<br>2. **Breach of Implied Contract**<br>3. **California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, *et seq.***<br>4. **California Consumer Privacy Act, Cal. Civ. Code § 1798.100, *et seq.***<br>5. **Declaratory Judgment**<br><br>**JURY TRIAL DEMANDED** |

Plaintiffs Megan Koester, Juanita Medina, Sedre Wright, LaSean Tardd, Adrine Akopyan, and Alisa Smith (collectively, "Plaintiffs"), individually and on behalf of all other similarly

1  situated individuals ("Class" or "Class Members," as defined below), by and through their

2  undersigned counsel, file this Consolidated Class Action Complaint against Crossroads Trading

3  Co., Inc. ("Crossroads" or "Defendant") and allege the following based on personal knowledge of

4  facts, upon information and belief, and based on the investigation of their counsel as to all other

5  matters.

## I.    INTRODUCTION

6

7          1.      Plaintiffs bring this class action lawsuit against Crossroads for its failure to protect

8  and safeguard Plaintiffs' and the Class Members' highly sensitive personally identifiable

9  information ("PII"). As a result of Crossroads' insufficient data security, cybercriminals infiltrated

10  Defendant's computer systems and accessed the PII of Plaintiffs and a Class of approximately

11  60,041 individuals ("Data Breach" or "Breach").[1] This PII is now in the hands of cybercriminals

12  who will use Plaintiffs' and Class Members' PII for nefarious purposes for the rest of their lives.

13          2.      Crossroads is a retail business that buys, sells, and trades secondhand and vintage

14  clothing items. During the course of its business, Crossroads collected highly sensitive PII from

15  Plaintiffs and Class Members.

16          3.      According to Defendant, on February 15, 2025, an unauthorized third-party gained

17  access to its server and encrypted data on its network.[2]

18          4.      Defendant provides little information about how the Breach occurred, but

19  confirmed that the following types of PII were implicated in the Breach: names, Social Security

20  numbers ("SSN"), driver's license numbers, and government-issued ID numbers (e.g., passports

21  and state ID cards) (collectively, "Private Information").[3] Shortly after the Data Breach, a

22  notorious ransomware group known as "Qilin," claimed responsibility for the incident.[4]

23

---

24  [1] https://www.maine.gov/agviewer/content/ag/985235c7-cb95-4be2-8792-
25  a1252b4f8318/6a3ad897-f2c7-485b-a2aa-8b687d7dda10.html.
    [2] *Id.*
26  [3] https://oag.my.site.com/datasecuritybreachreport/apex/DataSecurityReportsPage(search
    "Crossroads Trading Co., Inc.").
27  [4] https://www.breachsense.com/breaches/crossroads-trading-data-breach/.

28

5.      Defendant disregarded the rights of Plaintiffs and Class Members by intentionally, willfully, recklessly and/or negligently failing to take and implement adequate and reasonable data security measures to ensure that: (i) Plaintiffs' and the Class's Private Information was safeguarded; (ii) failing to take readily available steps to prevent an unauthorized disclosure of Private Information; and (iii) failing to follow applicable, required, and appropriate protocols, policies and procedures regarding the encryption of Private Information, even for internal use.

6.      Due to Crossroads' failure to secure and protect Plaintiffs' and Class Members' Private Information, cybercriminals have **_stolen_** and obtained everything they need to commit identity theft and fraud, and Plaintiffs and the Class will be faced with these risks in perpetuity.

7.      Plaintiffs and Class Members have incurred and will continue to incur damages in the form of, among other things, identity theft, attempted identity theft, lost time and expenses mitigating harms, increased risk of harm, damaged credit, diminution of the value of their Private Information, loss of privacy, and/or additional damages as described below.

8.      Plaintiffs and Class Members have a continuing interest in ensuring that their information is and remains safe, and they are entitled to injunctive and other equitable relief.

9.      Plaintiffs bring this action individually and on behalf of the Class, seeking compensatory damages, punitive damages, nominal damages, restitution, injunctive and declaratory relief, reasonable attorneys' fees and costs, and all other remedies this Court deems just and proper.

## II.     THE PARTIES

*Plaintiffs*

10.     Plaintiff **Megan Koester** is, and at all relevant times was, a California resident. Plaintiff Koester received a Notice of Data Breach Letter ("Notice Letter") from Crossroads dated March 26, 2025, notifying her that her name, driver's license number or other state ID number were compromised in the Data Breach. Upon information and belief, her Social Security number was also compromised in the Data Breach.

11.    Plaintiff **Juanita Medina** is, and at all relevant times was, a California resident. Plaintiff Medina received a Notice Letter from Crossroads dated March 26, 2025, notifying her that her name, and driver's license number or other state ID number were compromised in the Data Breach. Upon information and belief, her Social Security number was also compromised in the Data Breach.

12.    Plaintiff **Adrine Akopyan** is, and at all relevant times was, a California resident. Plaintiff Akopyan received a Notice Letter from Crossroads dated March 26, 2025, notifying her that her name and driver's license number, or other state ID number, were compromised in the Data Breach. Upon information and belief, her Social Security number was also compromised in the Data Breach.

13.    Plaintiff **Alisa Smith** is, and at all relevant times was, a California resident. Plaintiff Smith received a Notice Letter from Crossroads dated March 26, 2025, notifying her that her name, driver's license number or other state ID number were compromised in the Data Breach. Upon information and belief, her Social Security number was also compromised in the Data Breach.

14.    Plaintiff **Sedre Wright** is, and at all relevant times was, a California resident. Plaintiff Wright received a Notice Letter from Crossroads dated March 26, 2025, notifying him that his name, driver's license number or other state ID number were compromised in the Data Breach. Upon information and belief, his Social Security number was also compromised in the Data Breach.

15.    Plaintiff **LaSean Tardd** is, and at all relevant times was, a New York resident. Plaintiff Tardd received a Notice Letter from Crossroads dated March 26, 2025, notifying her that her name, driver's license number or other state ID number were compromised in the Data Breach. Upon information and belief, her Social Security number was also compromised in the Data Breach.

***Defendant***

16.    Crossroads is a company with its principal place of business located at 1409 Fifth

1    Street, Berkely, CA 94710.

2                    **III.    JURISDICTION AND VENUE**

3            17.    This Court has subject matter jurisdiction over this action pursuant to the Class

4    Action Fairness Act of 2005, 28 U.S.C. § 1332(a) and (d), because the matter in controversy,

5    exclusive of interest and costs, exceeds the sum or value of five million dollars ($5,000,000.00),

6    there are in excess of 100 Class Members, the action is a class action in which one or more Class

7    Members are citizens of states different from Defendant, and Defendant is not a government entity.

8            18.    Supplemental jurisdiction to adjudicate issues pertaining to state law is proper in

9    this Court under 28 U.S.C. § 1367.

10           19.    The Court has personal jurisdiction as Defendant is headquartered in this District

11   and has its principal place of business in this District. Defendant also has sufficient minimum

12   contacts in California and has intentionally availed itself of this jurisdiction by marketing and

13   selling products and services and by accepting and processing payments for those products and

14   services within California.

15           20.    Venue is proper in this Court under 28 U.S.C. § 1391(b)(1) because a substantial

16   part of the events that gave rise to Plaintiffs' claims took place within this District, and Defendant

17   does business and has its headquarters and principal place of business in this District.

18                   **IV.    FACTUAL ALLEGATIONS**

19   **A. Crossroads and its Collection of Private Information.**

20           20.    Crossroads is a secondhand clothes company that was founded in 1991.[5]

21           21.    Crossroads buys, sells, and trades secondhand and vintage clothing items.[6] It

22   operates multiple store locations throughout the United States and specializes in curating pre-

23   owned clothing and accessories from various contemporary and designer brands.[7]

24           22.    "At Crossroads, customers sell their current, on-trend clothing and accessories for

25   _____

26   [5] https://crossroadstrading.com/about-us-2/.

27   [6] https://crossroadstrading.com/.
     [7] *Id.*

28

cash or trade credit."[8]

23.    Crossroads' estimated annual revenue is $149.1 million per year.[9] In other words, Crossroads could have afforded to implement adequate data security prior to the Breach but failed to do so.

24.    In the ordinary course of business, Crossroads receives Private Information of individuals, such as Plaintiffs and the Class, through its customers and its current and former employees.

25.    Crossroads obtains, collects, uses, and derives a benefit from this Private Information. Crossroads uses the Private Information it collects to provide services to its clients, making a profit therefrom. Crossroads would not be able to obtain revenue if not for the acceptance and use of Private Information.

26.    Plaintiffs and Class Members are, or were, customers or employees of Crossroads, or otherwise are affiliated or transacted with Crossroads, and entrusted Crossroads with their Private Information.

27.    Plaintiffs and Class Members reasonably relied on Crossroads to maintain the confidentiality and security of their Private Information and to only make the required, authorized disclosures of this information, which Defendant ultimately failed to do.

28.    By collecting Private Information, Crossroads assumed legal and equitable duties to Plaintiffs and the Class to protect and safeguard their Private Information from unauthorized access and intrusion.

29.    Crossroads recognizes this duty and makes the following claim on its website regarding its protection of sensitive data: "The security of Your Personal Data is important to Us… We strive to use commercially acceptable means to protect Your Personal Data...."[10]

---

[8] *Id.*
[9] https://growjo.com/company/Crossroads_Trading_Co#google_vignette.
[10] https://crossroadstrading.com/privacy-policy/.

30. Crossroads' assurances of maintaining high standards of cybersecurity make it evident that Crossroads recognized it had a duty to use reasonable measures to protect the Private Information that it collected and maintained.

31. Despite a tacit acknowledgment of its duty to protect Private Information wth adequate data security, Crossroads did not implement reasonable cybersecurity safeguards or policies to protect consumers' Private Information. As a result, Crossroads has significant vulnerabilities in its systems that cybercriminals can exploit to gain access to consumers' Private Information.

32. Crossroads violated its own Privacy Policy and failed to adopt reasonable and appropriate security practices and procedures including administrative, physical security, and technical controls to safeguard Plaintiffs' and the Class Members' Private Information. This resulted in the Data Breach that ultimately came to pass.

**B. Defendant's Massive and Preventable Data Breach.**

33. On or about February 15, 2025, an unauthorized third party gained access to Crossroad's network systems.

34. Over a month later, on or about March 26, 2025, Crossroads issued Notice Letters to victims of the Data Breach, stating the following:

> Crossroads Trading Co., Inc. ("Crossroads" or the "Company") takes seriously its obligation to safeguard the personal information of our customers. Unfortunately, Crossroads recently learned that it was the victim of a security incident. We are writing to provide you with information about the scope of the incident and share with you the steps that Crossroads is taking to address it.
>
> On February 15, 2025, an unauthorized third-party gained access to our server and encrypted data stored on the Company's network. The Company's IT team immediately responded to the incident and was able to swiftly secure our network, restore systems, and prevent further access by the third-party. Crossroads retained a team of expert forensic investigators and performed a comprehensive investigation, which confirmed that the third-party's access was limited to a segment of the Company's network. Crossroads also engaged a cyberthreat firm and took affirmative steps to prevent the encrypted data from being published, distributed or misused.

**We have no evidence that your personal information has been, or will be, misused or published.** Nevertheless, we are notifying you because our investigation has determined that the encrypted data included at least one document that contained your name and [CATEGORIES OF DATA].

As a precautionary measure, the Company is offering you two years of identity protection services through Experian, at no cost to you. This two-year membership in Experian's IdentityWorksSM product provides identity restoration services, fraud detection tools, and other benefits, which include monitoring your credit file at Experian.

You can call Experian's identity restoration agents to assist you in investigating and resolving any incidents of fraud. You may take advantage of this benefit, at any time within the next two years by calling Experian at 833-918-6165. No enrollment or activation is necessary. The terms and conditions for identity restoration are located at: www.ExperianIDWorks.com/restoration. [11]

35.    The Notice Letter omits pertinent information, including: (i) how criminals gained access to the Private Information on its systems; (ii) what computer systems were impacted; (iii) the means and mechanisms of the Data Breach; (iv) how it determined that the Private Information had been accessed; and (v) what steps Crossroads took following the Data Breach to secure its systems and train its employees to prevent further cyberattacks. To date, these omitted details have not been explained or clarified to Plaintiffs and Class Members, who retain a vested interest in ensuring that their Private Information remains protected.

36.    Crossroads also failed to disclose in the Notice Letters that a well-known cybercriminal ransomware group—Qilin—perpetrated the Data Breach.

37.    On or about February 21, 2025, cybercriminals affiliated with the ransomware group Qilin publicly claimed responsibility for exfiltrating data from Crossroads. [12] A posting on a dark web leak site used by Qilin stated that the stolen data would be made publicly available for download on February 27, 2025. [13]

---

[11] https://ago.vermont.gov/sites/ago/files/documents/2025-03-25%20Crossroads%20Trading%20Data%20Breach%20Notice%20to%20Consumers.pdf .
[12] *[QILIN] – Ransomware Victim: Crossroads Trading Company, Inc.*, RedPacket Sec. (Feb. 21, 2025).
[13] *Id.*

38.     Qilin is a ransomware-as-a-service (RaaS) operation that has been active since mid-2022 and is also known by the alias "Agenda."[14] Qilin enables affiliates to deploy its ransomware in exchange for a share of any ransom payments collected, typically keeping 15–20% of proceeds.[15] The group is believed to operate from Russia and has targeted organizations across multiple sectors worldwide.[16]

39.     Qilin is known to employ double extortion tactics "involving the exfiltration of a victim's sensitive data in addition to encrypting it. They demand payment for a decryptor and threaten to release stolen data even after the ransom is paid. Qilin ransomware offers various encryption modes, all controlled by the operator."[17]

---

[14] https://www.aha.org/cybersecurity-government-intelligence-reports/2024-06-21-tlp-clear-hc3-threat-profile-qilin-aka-agenda-ransomware-june-18-2024.

[15] *Id.*

[16] *Id.*

[17] https://cyberint.com/blog/research/qilin-ransomware/

40.     As shown below, Qilin has already deployed its signature tactic here. Qilin stole the Private Information of Plaintiffs and the Class and threatened to release it on the dark web, stating: "[a]ll data of this company will be available for download on 27.02.2025" and detailing Crossroad's business history."



41. Blurred samples of the data leak are shown in the screenshot below.



42. Defendant failed to implement reasonable cybersecurity measures sufficient to prevent intrusion by known and active threat groups such as Qilin. The February 2025 posting on Qilin's leak site confirms that the breach resulted in actual—not hypothetical—exposure of sensitive Private Information.

43. Despite learning of the Data Breach at least as early as February 2025, Crossroads did not begin notifying individuals of the Data Breach until the end of March 2025.

44. In recognition of the severity of the Data Breach, Crossroads made a limited offering of 24 months of credit monitoring and identity theft protection services. Such an offering is inadequate and will not prevent identity theft but will only alert Data Breach victims once identity theft has already occurred.

45. As evidenced by the Data Breach, the Private Information contained in Defendant's network was not encrypted. Had the information been properly encrypted, the data thieves would

have exfiltrated only unintelligible data.

46.    Crossroads failed to take the necessary precautions required to safeguard and protect Plaintiffs' and Class Members' Private Information from unauthorized access and exploitation.

**C. Cybercriminals Will Misuse Plaintiffs' and the Class Members' Private Information.**

47.    Private Information is of great value to hackers and cybercriminals, and the data stolen in the Data Breach can and will be used in a variety of ways by criminals to exploit Plaintiffs and the Class Members and to profit from their misfortune.

48.    Each year, identity theft causes tens of billions of dollars of losses to victims in the United States.[18]

49.    Private Information is such a valuable commodity to identity thieves that once it has been compromised, criminals will use it for years.[19]

50.    In April 2020, ZDNet reported in an article titled "Ransomware mentioned in 1,000+ SEC filings over the past year", that "[r]ansomware gangs are now ferociously aggressive in their pursuit of big companies. They breach networks, use specialized tools to maximize damage, leak corporate information on dark web portals, and even tip journalists to generate negative news for complaints as revenge against those who refuse to pay."[20]

51.    In September 2020, the United States Cybersecurity and Infrastructure Security Agency published online a "Ransomware Guide" advising that "[m]alicious actors have adjusted their ransomware tactics over time to include pressuring victims for payment by threatening to

---

[18] *Facts + Statistics: Identity Theft and Cybercrime*, INSURANCE INFO. INST., https://www.iii.org/fact-statistic/facts-statistics-identity-theft-and-cybercrime (discussing Javelin Strategy & Research's report "2018 Identity Fraud: Fraud Enters a New Era of Complexity").
[19] *Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown*, GAO, July 5, 2007, available at https://www.gao.gov/products/gao-07-737.
[20] https://www.zdnet.com/article/ransomware-mentioned-in-1000-sec-filings-over-the-past-year/.

release stolen data if they refuse to pay and publicly naming and shaming victims as secondary forms of extortion."[21]

52.    This was a financially motivated breach, as the only reason the cybercriminals go through the trouble of running targeted cyberattacks against companies like Crossroads is to get ransom money and/or information that they can monetize by selling on the black market for use in the kinds of criminal activity described herein.[22]

53.    The Private Information of consumers is of high value to criminals, as evidenced by the prices they will pay through the dark web. Numerous sources cite dark web pricing for stolen identity credentials. For example, PII can be sold at a price ranging from $40 to $200, and bank details have a price range of $50 to $2009.[23] Experian reports that a stolen credit or debit card number can sell for $5 to $110 on the dark web.[24] Criminals can also purchase access to entire company data breaches.[25]

54.    One example of criminals piecing together bits and pieces of compromised PII for profit is the development of "Fullz" packages.[26]

---

[21] *See* https://www.cisa.gov/sites/default/files/2023-01-CISA_MSISAC_Ransomware%20Guide_8508C.pdf.

[22]    *Shining a Light on the Dark Web with Identity Monitoring,* IdentityForce, Dec. 28, 2020, https://www.identityforce.com/blog/shining-light-dark-web-identity-monitoring.

[23] *Your personal data is for sale on the dark web. Here's how much it costs*, Digital Trends, Oct. 16, 2019, https://www.digitaltrends.com/computing/personal- data-sold-on-the-dark-web- how-much-it-costs/.

[24] *Here's How Much Your Personal Information Is Selling for on the Dark Web*, Experian, Dec. 6, 2017, https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is- selling-for-on-the-dark-web/.

[25] *In the Dark*, VPNOverview, 2019, https://vpnoverview.com/privacy/anonymous- browsing/in-the- dark/.

[26] "Fullz" is fraudster speak for data that includes the information of the victim, including, but not limited to, the name, address, credit card information, social security number, date of birth, and more. As a rule of thumb, the more information you have on a victim, the more money that can be made off of those credentials. Fullz are usually pricier than standard credit card credentials, commanding up to $100 per record (or more) on the dark web. Fullz can be cashed out (turning credentials into money) in various ways, including performing bank transactions over the phone with the required authentication details in-hand. Even "dead Fullz," which are Fullz credentials associated with credit cards that are no longer valid, can still be used for

55.    With "Fullz" packages, cyber-criminals can cross-reference two sources of PII to marry unregulated data available elsewhere to criminally stolen data with an astonishingly complete scope and degree of accuracy to assemble complete dossiers on individuals.

56.    The development of "Fullz" packages means here that the stolen PII from the Data Breach can easily be used to link and identify it to Plaintiffs' and Class Members' phone numbers, email addresses, and other unregulated sources and identifiers. In other words, even if certain information such as emails, phone numbers, or credit card numbers may not be included in the PII that was exfiltrated in the Data Breach, criminals may still easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers).

57.    Such risks are both certainly impending and substantial. As the Federal Trade Commission ("FTC") has reported, if hackers get access to PII, ***they will use it***.[27]

58.    Hackers may not use the information right away, but this does not mean it will not be used. According to the U.S. Government Accountability Office, which conducted a study regarding data breaches:

> [I]n some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information ***may continue for years***. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[28]

---

numerous purposes, including tax refund scams, ordering credit cards on behalf of the victim, or opening a "mule account" (an account that will accept a fraudulent money transfer from a compromised account) without the victim's knowledge. See, e.g., Brian Krebs, Medical Records for Sale in Underground Stolen From Texas Life Insurance Firm, Krebs on Security (Sep. 18, 2014), https://krebsonsecurity.com/2014/09/medical-records-for-sale-in-underground-stolen-from-texas-life-insurance-](https://krebsonsecurity.com/2014/09/medical-records-for-sale-in-underground-stolen-from-texas-life-insurance-fin

[27] Ari Lazarus, *How fast will identity thieves use stolen info?*, MILITARY CONSUMER (May 24, 2017),    https://www.militaryconsumer.gov/blog/how-fast-will-identity-thieves-use-stolen-info    (emphasis added).

[28] *Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown,* GAO (July 5, 2007), available at https://www.gao.gov/products/gao-07-737 (emphasis added).

59.    With the Private Information stolen in the Data Breach, including SSNs, identity thieves can: (i) open financial accounts; (ii) apply for credit; (iii) file fraudulent tax returns; (iv) commit crimes; (iv) create false driver's licenses and other forms of identification and sell them to other criminals or undocumented immigrants; (v) steal government benefits; (vi) give Breach victims' names to police during arrests; and (vi) many other harmful forms of identity theft.[29] These criminal activities have and will result in devastating financial and personal losses to Plaintiffs and the Class Members.

60.    SSNs are particularly sensitive pieces of personal information. As the Consumer Federation of America explains:

> **Social Security number.** *This is the most dangerous type of personal information in the hands of identity thieves* because it can open the gate to serious fraud, from obtaining credit in your name to impersonating you to get medical services, government benefits, your tax refunds, employment – even using your identity in bankruptcy and other legal matters. It's hard to change your Social Security number and it's not a good idea because it is connected to your life in so many ways.[30] (Emphasis added).

61.    Driver's license numbers, which were compromised in the Data Breach, also are incredibly valuable. "Hackers harvest license numbers because they're a very valuable piece of information.[31]

62.    A driver's license can be a critical part of a fraudulent, synthetic identity—which go for about $1,200 on the Dark Web. On its own, a forged license can sell for around $200."[32]

63.    According to national credit bureau Experian:

---

[29] *See, e.g.*, Christine DiGangi, *What Can You Do with a Stolen Social Security Number*, CREDIT.COM (June 29, 2020), https://blog.credit.com/2017/11/5-things-an-identity-thief-can-do-with-your-social-security-number-108597/.

[30] *Dark Web Monitoring: What You Should Know*, CONSUMER FEDERATION OF AMERICA (Mar. 19, 2019), https://consumerfed.org/consumer_info/dark-web-monitoring-what-you-should-know/.

[31] *Hackers Stole Customers' License Numbers From Geico In Months-Long Breach*, Forbes, Apr. 20, 2021, available at: https://www.forbes.com/sites/leemathews/2021/04/20/hackers-stole-customers-license-numbers-from-geico-in-months-long-breach/?sh=3bda585e8658 (last visited July 31, 2023).

[32] https://www.forbes.com/sites/leemathews/2021/04/20/hackers-stole-customers-license-numbers-from-geico-in-months-long-breach/?sh=3e4755c38658 (last visited on Feb. 21, 2023).

A driver's license is an identity thief's paradise. With that one card, someone knows your birthdate, address, and even your height, eye color, and signature. If someone gets your driver's license number, it is also concerning because it's connected to your vehicle registration and insurance policies, as well as records on file with the Department of Motor Vehicles, place of employment (that keep a copy of your driver's license on file), doctor's office, government agencies, and other entities. Having access to that one number can provide an identity thief with several pieces of information they want to know about you. Next to your Social Security number, your driver's license number is one of the most important pieces of information to keep safe from thieves.

64.    According to cybersecurity specialty publication CPO Magazine, "[t]o those unfamiliar with the world of fraud, driver's license numbers might seem like a relatively harmless piece of information to lose if it happens in isolation."[33] However, this is not the case. As cybersecurity experts point out: "It's a gold mine for hackers. With a driver's license number, bad actors can manufacture fake IDs, slotting in the number for any form that requires ID verification, or use the information to craft curated social engineering phishing attacks."[34]

65.    Victims of driver's license number theft also often suffer unemployment benefit fraud, as described in a recent New York Times article.[35]

66.    Based on the foregoing, the information compromised in the Data Breach is significantly more valuable than the loss of, for example, credit card information in a retailer data breach because, there, victims can cancel or close credit and debit card accounts. The information compromised in this Data Breach cannot simply be "closed" like a payment card and is difficult, if not impossible, to change.

67.    The data impacted in the Breach demands a much higher price on the black market. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "Compared to credit card

---

[33] https://www.cpomagazine.com/cyber-security/geico-data-breach-leaks-drivers-license-numbers-advises-customers-to-watch-out-for-fraudulent-unemployment-claims/ (last visited on Feb. 21, 2023).

[34] https://www.cpomagazine.com/cyber-security/geico-data-breach-leaks-drivers-license-numbers-advises-customers-to-watch-out-for-fraudulent-unemployment-claims/ (last visited on Feb. 21, 2023).

[35] *How Identity Thieves Took My Wife for a Ride*, NY Times, April 27, 2021, available at: https://www.nytimes.com/2021/04/27/your-money/identity-theft-auto-insurance.html (last visited on Feb. 21, 2023).

information, personally identifiable information and Social Security numbers are worth more than 10x on the black market."[36]

68.    Identity theft victims must now spend countless hours and large amounts of money repairing the impact to their credit as well as protecting themselves in the future.[37]

69.    Defendant's offer of 24 months of identity monitoring to Plaintiffs and the Class is woefully inadequate to protect Plaintiffs and the Class from the damages and harm caused by its failures.

70.    Once the 24 months have expired, Plaintiffs and Class Members will need to pay for their own identity theft protection and credit monitoring for the rest of their lives due to Crossroads' gross negligence.

71.    Furthermore, identity monitoring only alerts someone to the fact that they have already been the victim of identity theft (i.e., fraudulent acquisition and use of another person's PII)—it does not prevent identity theft.[38] Nor can an identity monitoring service remove personal information from the dark web.[39]

72.    As a direct and proximate result of the Data Breach, Plaintiffs and the Class have been damaged and have been placed at an imminent, immediate, and continuing increased risk of harm. Plaintiffs and the Class must now take the time and effort to mitigate the actual and potential impact of the Data Breach on their everyday lives, including placing "freezes" and "alerts" with credit reporting agencies, contacting their financial institutions, closing or modifying financial

---

[36] Tim Greene, Anthem Hack: Personal Data Stolen Sells for 10x Price of Stolen Credit Card Numbers, IT World, (Feb. 6, 2015), available at: https://www.networkworld.com/article/2880366/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html.

[37] *Guide for Assisting Identity Theft Victims*, FEDERAL TRADE COMMISSION (Sept. 2013), *available at* https://www.global-screeningsolutions.com/Guide-for-Assisting-ID-Theft-Victims.pdf.

[38] *See, e.g.*, Kayleigh Kulp, *Credit Monitoring Services May Not Be Worth the Cost*, CNBC (Nov. 30, 2017, 9:00 AM), https://www.cnbc.com/2017/11/29/credit-monitoring-services-may-not-be-worth-the-cost.html.

[39] *Dark Web Monitoring: What You Should Know*, CONSUMER FEDERATION OF AMERICA (Mar. 19, 2019), https://consumerfed.org/consumer_info/dark-web-monitoring-what-you-should-know.

accounts, and closely reviewing and monitoring bank accounts and credit reports for unauthorized activity for years to come.

73.    Perhaps worse is the identity restoration that Plaintiffs and other Class Members must and will have to go through, which can include spending countless hours filing police reports, filling out IRS forms, Federal Trade Commission checklists, driver's license replacement applications, and calling financial institutions to cancel fraudulent credit applications, to name just a few of the steps Plaintiffs and the Class must take.

74.    Plaintiffs and the Class have or will experience the following concrete and particularized harms for which they are entitled to compensation, including:

     a.  Actual identity theft;

     b.  Trespass, damage to, and theft of personal property including Private Information;

     c.  Improper disclosure of Private Information;

     d.  The imminent and certainly impending injury flowing from potential fraud and identity theft posed by having their Private Information being placed in the hands of criminals;

     e.  Loss of privacy suffered because of the Data Breach, including the harm of knowing cyber criminals have their Private Information;

     f.  Ascertainable losses in the form of time taken to respond to identity theft and attempt to restore identity, including lost opportunities and lost wages from uncompensated time off from work;

     g.  Ascertainable losses in the form of out-of-pocket expenses and the value of time reasonably expended to remedy or mitigate the effects of the Data Breach;

     h.  Ascertainable losses in the form of deprivation of the value of Private Information for which there is a well-established and quantifiable national and international market;

     i.  The loss of use of and access to credit, accounts, and/or funds;

j.  Damage to credit due to fraudulent use of Private Information; and/or

k.  Increased cost of borrowing, insurance, deposits, and the inability to secure more favorable interest rates because of a reduced credit score.

75.  Plaintiffs and Class Members have an interest in ensuring that their Private Information, which remains in the possession of Defendant, is protected from further breaches by the implementation of industry standard security measures and safeguards. Defendant has shown itself wholly incapable of protecting sensitive Private Information.

76.  Plaintiffs and Class Members also have an interest in ensuring that their Private Information that was provided to Crossroads is removed from all of Crossroads' servers, email systems, and files.

77.  Defendant itself acknowledged the harm caused by the Data Breach because it offered Plaintiffs and Class Members limited identity theft repair and monitoring services.

78.  Defendant further acknowledged that the Data Breach would cause inconvenience to affected individuals and that financial harm would likely occur, and encouraged individuals to review their credit reports, review their account statements, and remain vigilant and respond to suspicious activity.[40]

79.  Additionally, the Notice Letter acknowledges that Crossroads needed to improve its cybersecurity protocols, stating, "Crossroads takes this incident very seriously and we have already taken steps to prevent a recurrence."[41] These enhanced protections should have been in place *before* the Data Breach.

80.  At Crossroads' suggestion, Plaintiffs and the Class have been trying and will continue to try to mitigate the damage that Crossroads has caused them.

81.  Given the kind of Private Information Crossroads made accessible to hackers, Plaintiffs are certain to incur additional damages. Because identity thieves have their Private Information, Plaintiffs and all Class Members will need to have identity theft monitoring

---

[40] https://www.maine.gov/cgi-bin/agviewerad/ret?loc=2311.

[41] *Id.*

protection indefinitely. Some may even need to go through the long and arduous process of getting a new SSN, with all the loss of credit and employment difficulties that come with a new number.[42]

**D. Defendant was Aware of the Risk of Cyberattacks and Should Have Prevented the Data Breach.**

82.    Data security breaches have dominated the headlines for the last two decades, including: Target,[43] Yahoo,[44] Marriott International,[45] Chipotle, Chili's, Arby's,[46] and others.[47]

83.    Data breaches have been on the rise for several years. In 2023, an all-time high for data compromises occurred, with 3,205 compromises affecting 353,027,892 total victims. The estimated number of organizations impacted by data compromises has increased by +2,600 percentage points since 2018, and the estimated number of victims has increased by +1,400 percentage points. The 2023 compromises represent a 78-percentage point increase over the previous year and a 72-percentage point hike from the previous all-time high number of compromises (1,860) set in 2021.

84.    Crossroads should have been aware, and was aware, that it was at risk of a data breach that could expose the Private Information that it collected and maintained.

---

[42] *What happens if I change my Social Security number*, LEXINGTON LAW (Aug. 10, 2022), https://www.lexingtonlaw.com/blog/credit-101/will-a-new-social-security-number-affect-your-credit.html.

[43] Michael Kassner, *Anatomy of the Target Data Breach: Missed Opportunities and Lessons Learned*, ZDNET (Feb. 2, 2015), https://www.zdnet.com/article/anatomy-of-the-target-data-breach-missed-opportunities-and-lessons-learned/.

[44] Martyn Williams, *Inside the Russian Hack of Yahoo: How They Did It*, CSOONLINE.COM (Oct. 4, 2017), https://www.csoonline.com/article/3180762/inside-the-russian-hack-of-yahoo-how-they-did-it.html.

[45] Patrick Nohe, *The Marriot Data Breach: Full Autopsy*, THE SSL STORE: HASHEDOUT (Mar. 22, 2019), https://www.thesslstore.com/blog/autopsying-the-marriott-data-breach-this-is-why-insurance-matters/.

[46] Alfred Ng, *FBI Nabs Alleged Hackers in Theft of 15M Credit Cards from Chipotle, Others*, CNET (Aug. 1, 2018, 12:58 PM), https://www.cnet.com/news/fbi-nabs-alleged-hackers-in-theft-of-15m-credit-cards-from-chipotle-others/?ftag=CMG-01-10aaa1b.

[47] *See, e.g.*, Michael Hill and Dan Swinhoe, *The 15 Biggest Data Breaches of the 21st Century*, CSO ONLINE (Nov. 8, 2022), https://www.csoonline.com/article/2130877/the-biggest-data-breaches-of-the-21st-century.html.

85.    Data breaches are preventable.[48] As Lucy Thompson wrote in the DATA BREACH AND ENCRYPTION HANDBOOK, "In almost all cases, the data breaches that occurred could have been prevented by proper planning and the correct design and implementation of appropriate security solutions."[49] She added that "[o]rganizations that collect, use, store, and share sensitive personal data must accept responsibility for protecting the information and ensuring that it is not compromised . . . ."[50]

86.    "Most of the reported data breaches are a result of lax security and the failure to create or enforce appropriate security policies, rules, and procedures. . . . Appropriate information security controls, including encryption, must be implemented and enforced in a rigorous and disciplined manner so that a *data breach never occurs*."[51]

87.    The FTC has issued several guides for businesses, highlighting the importance of reasonable data security practices. According to the FTC, the need for data security should be considered for all business decision-making.[52]

88.    Under the FTC's 2016 *Protecting Personal Information: Guide for Business* publication, the FTC notes that businesses should safeguard the personal customer information they retain; properly dispose of unnecessary personal information; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to rectify security issues.[53]

---

[48] Lucy L. Thomson, "Despite the Alarming Trends, Data Breaches Are Preventable," *in* DATA BREACH AND ENCRYPTION HANDBOOK (Lucy Thompson, ed., 2012), available at https://lawcat.berkeley.edu/record/394088.
[49] *Id.* at 17.
[50] *Id.* at 28.
[51] *Id.*
[52] *Start With Security*, Fed. Trade Comm'n ("FTC"), https://www.ftc.gov/system/files/ documents/plain-language/pdf0205-startwithsecurity.pdf.
[53] *Protecting Personal Information: A Guide for Business*, FTC, https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf

89.    The guidelines also suggest that businesses use an intrusion detection system to expose a breach as soon as it happens, monitor all incoming traffic for activity indicating someone is trying to hack the system, watch for large amounts of data being siphoned from the system, and have a response plan in the event of a breach.

90.    The FTC advises companies to not keep information for periods of time longer than needed to authorize a transaction, restrict access to PII, mandate complex passwords to be used on networks, utilize industry-standard methods for security, monitor for suspicious activity on the network, verify that third-party service providers have implemented reasonable security measures, and have a response plan ready in the event of a breach.

91.    The FTC has brought enforcement actions against companies for failing to adequately and reasonably protect consumer data, treating the failure to do so as an unfair act or practice barred by Section 5 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45. Orders originating from these actions further elucidate the measures businesses must take to satisfy their data security obligations.

92.    Crossroads failed to adhere to reasonable and necessary industry standards necessary to prevent a Data Breach, including the FTC's guidelines.

93.    Defendant's failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

94.    Defendant's failure to verify that it had implemented reasonable security measures constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

95.    Several best practices have been identified that, at a minimum, should be implemented by retail companies in possession of PII, like Defendant, including but not limited to: educating all employees; strong passwords; multi-layer security, including firewalls, anti-virus, and anti-malware software; encryption, making data unreadable without a key; multi-factor authentication; backup data and limiting which employees can access sensitive data. Defendant

failed to follow these industry best practices, including a failure to implement multi-factor authentication.

96.    Other best cybersecurity practices that are standard for retail companies include installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches and routers; monitoring and protection of physical security systems; protection against any possible communication system; training staff regarding critical points. Defendant failed to follow these cybersecurity best practices, including failure to train staff

97.    Upon information and belief, Crossroads also failed to meet the minimum standards of any of the following frameworks: the NIST Cybersecurity Framework 2.0 (including without limitation PR.AA-01, PR.AA.-02, PR.AA-03, PR.AA-04, PR.AA-05, PR.AT-01, PR.DS-01, PR-DS-02, PR.DS-10, PR.PS-01, PR.PS-02, PR.PS-05, PR.IR-01, DE.CM-01, DE.CM-03, DE.CM-06, DE.CM-09, and RS.CO-04), NIST Special Publications 800-53, 53A, or 800-171; the Federal Risk and Authorization Management Program (FEDRAMP); or the Center for Internet Security's Critical Security Controls (CIS CSC), which are well respected authorities in reasonable cybersecurity readiness.

98.    These frameworks are existing and applicable industry standards for retail companies, and upon information and belief, Defendant failed to comply with at least one—or all––of these accepted standards, thereby opening the door to the threat actor and causing the Data Breach

99.    As explained by the Federal Bureau of Investigation, "[p]revention is the most effective defense against ransomware and it is critical to take precautions for protection."[54]

100.    To prevent and detect the Breach, Defendant could and should have implemented, as recommended by the Federal Bureau of Investigation, the following measures:

---

[54] *See* How to Protect Your Networks from RANSOMWARE, at 3, available at https://www.fbi.gov/file-repository/ransomware-prevention-and-response-for-cisos.pdf/view.

1    • Implement an awareness and training program. Because end users are targets,
2      employees and individuals should be aware of the threat of ransomware and
3      how it is delivered.
4    • Enable strong spam filters to prevent phishing emails from reaching the end
5      users and authenticate inbound email using technologies like Sender Policy
6      Framework (SPF), Domain Message Authentication Reporting and
7      Conformance (DMARC), and DomainKeys Identified Mail (DKIM) to prevent
8      email spoofing.
9    • Scan all incoming and outgoing emails to detect threats and filter executable
10     files from reaching end users.
11   • Configure firewalls to block access to known malicious IP addresses.
12   • Patch operating systems, software, and firmware on devices. Consider using a
13     centralized patch management system.
14   • Set anti-virus and anti-malware programs to conduct regular scans
15     automatically.
16   • Manage the use of privileged accounts based on the principle of least privilege:
17     no users should be assigned administrative access unless absolutely needed; and
18     those with a need for administrator accounts should only use them when
19     necessary.
20   • Configure access controls—including file, directory, and network share
21     permissions—with least privilege in mind. If a user only needs to read specific
22     files, the user should not have write access to those files, directories, or shares.
23   • Disable macro scripts from office files transmitted via email. Consider using
24     Office Viewer software to open Microsoft Office files transmitted via email
25     instead of full office suite applications.
26
27
28

- Implement Software Restriction Policies (SRP) or other controls to prevent programs from executing from common ransomware locations, such as temporary folders supporting popular Internet browsers or compression/decompression programs, including the AppData/LocalAppData folder.

- Consider disabling Remote Desktop protocol (RDP) if it is not being used.

- Use application whitelisting, which only allows systems to execute programs known and permitted by security policy.

- Execute operating system environments or specific programs in a virtualized environment.

- Categorize data based on organizational value and implement physical and logical separation of networks and data for different organizational units.[55]

101.    Further, Defendant could and should have implemented, as recommended by the United States Cybersecurity & Infrastructure Security Agency, the following measures:

- **Update and patch your computer**. Ensure your applications and operating systems (OSs) have been updated with the latest patches. Vulnerable applications and OSs are the target of most ransomware attacks….

- **Use caution with links and when entering website addresses**. Be careful when clicking directly on links in emails, even if the sender appears to be someone you know. Attempt to independently verify website addresses (e.g., contact your organization's helpdesk, search the internet for the sender organization's website or the topic mentioned in the email). Pay attention to the website addresses you click on, as well as those you enter yourself. Malicious website addresses often appear almost identical to legitimate sites, often using a slight variation in spelling or a different domain (e.g., .com instead of .net)….

---

[55] *Id.* at 3–4.

- **Open email attachments with caution**. Be wary of opening email attachments, even from senders you think you know, particularly when attachments are compressed files or ZIP files.

- **Keep your personal information safe**. Check a website's security to ensure the information you submit is encrypted before you provide it….

- **Verify email senders**. If you are unsure whether or not an email is legitimate, try to verify the email's legitimacy by contacting the sender directly. Do not click on any links in the email. If possible, use a previous (legitimate) email to ensure the contact information you have for the sender is authentic before you contact them.

- **Inform yourself**. Keep yourself informed about recent cybersecurity threats and up to date on ransomware techniques. You can find information about known phishing attacks on the Anti-Phishing Working Group website. You may also want to sign up for CISA product notifications, which will alert you when a new Alert, Analysis Report, Bulletin, Current Activity, or Tip has been published.

- **Use and maintain preventative software programs**. Install antivirus software, firewalls, and email filters—and keep them updated—to reduce malicious network traffic….[56]

102.    In addition, Defendant could and should have implemented, as recommended by the Microsoft Threat Protection Intelligence Team, the following measures:

- **Secure internet-facing assets**
    - Apply latest security updates
    - Use threat and vulnerability management

---

[56] *See* Security Tip (ST19-001) Protecting Against Ransomware (original release date Apr. 11, 2019), available at https://www.cisa.gov/news-events/news/protecting-against-ransomware.

- Perform regular audit; remove privileged credentials
- **Thoroughly investigate and remediate alerts**
  - Prioritize and treat commodity malware infections as potential full compromise;
- **Include IT Pros in security discussions**
  - Ensure collaboration among [security operations], [security admins], and [information technology] admins to configure servers and other endpoints securely;
- **Build credential hygiene**
  - Use [multifactor authentication] or [network level authentication] and use strong, randomized, just-in-time local admin passwords
- **Apply principle of least-privilege**
  - Monitor for adversarial activities
  - Hunt for brute force attempts
  - Monitor for cleanup of Event Logs
  - Analyze logon events
- **Harden infrastructure**
  - Use Windows Defender Firewall
  - Enable tamper protection
  - Enable cloud-delivered protection
  - Turn on attack surface reduction rules and [Antimalware Scan Interface] for Office [Visual Basic for Applications].[57]

103.    Given that Defendant was storing the Private Information of thousands of individuals, it could have and should have implemented all the above measures.

---

[57] *See* Human-operated ransomware attacks: A preventable disaster (Mar. 5, 2020), *available at* https://www.microsoft.com/security/blog/2020/03/05/human-operated-ransomware-attacks-a-preventable-disaster/.

104.     Specifically, among other failures, Crossroads had far too much confidential unencrypted information held on its systems. Such Private Information should have been segregated into an encrypted system.[58]

105.     Moreover, it is well-established industry standard practice for a business to dispose of confidential PII once it is no longer needed.

106.     The FTC, among others, has repeatedly emphasized the importance of disposing unnecessary PII, saying simply: "Keep sensitive data in your system only as long as you have a business reason to have it. Once that business need is over, properly dispose of it. If it's not on your system, it can't be stolen by hackers."[59] Crossroads, rather than following this basic standard of care, kept thousands of individuals' unencrypted PII indefinitely.

107.     In sum, the Data Breach could have readily been prevented using industry standard network segmentation and encryption of all PII.

108.     Further, the scope of the breach could have been dramatically reduced had Crossroads utilized proper record retention and destruction practices.

109.     At all relevant times, Defendant knew, or reasonably should have known, of the importance of safeguarding Private Information and the foreseeable consequences that would occur if Defendant's data security system was breached, including, specifically, the significant costs that would be imposed on Plaintiffs and Class Members as a result of a breach.

110.     Plaintiffs and Class Members now face years of constant surveillance of their financial and personal records, monitoring, and loss of rights. The Class is incurring and will continue to incur such damages in addition to any fraudulent use of their Private Information.

---

[58] *See, e.g.,* Adnan Raja, *How to Safeguard Your Business Data with Encryption*, FORTRA (Aug. 14, 2018), https://digitalguardian.com/blog/how-safeguard-your-business-data-encryption.
[59] *Protecting Personal Information: A Guide for Business*, FTC, available *at* https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf, at p. 6.

**E. Plaintiffs' Individual Experiences**

*Plaintiff Megan Koester*

111.    Plaintiff Koester received a Notice Letter in or around March 2025, from Defendant informing her that her highly confidential Private Information was compromised in the Data Breach.

112.    Defendant was in possession of Plaintiff Koester's Private Information before, during, and after the Data Breach.

113.    Believing Crossroads would implement and maintain reasonable data security practices to protect customers' and other affiliated persons' Private Information, Plaintiff Koester provided Crossroads with Private Information, or otherwise had Private Information provided to Crossroads.

114.    Because of the Data Breach, there is no doubt Plaintiff Koester's highly confidential Private Information is in the hands of cybercriminals. Reason being, the Notice of Data Breach Letter from Defendant disclosed that an unauthorized third-party had accessed Defendant's systems. The *modus operandi* of cybercriminals involves stealing Private Information for financial gain. Cybercriminals may use stolen identities to conceal their own true identity or carry out a range of fraudulent activities, from credit card fraud to impersonation. As such, Plaintiff Koester and the Class are at an imminent risk of identity theft and fraud.

115.    Plaintiff Koester has made reasonable efforts to mitigate the impact of the Data Breach.

116.    As a result of the Data Breach, Plaintiff Koester has already expended hours of her time and has suffered loss of productivity from taking time to address and attempt to ameliorate, mitigate, and address the future consequences of the Data Breach. This includes: (i) investigating the Data Breach; (ii) investigating how best to ensure that she is protected from identity theft; and/or (iii) reviewing her account statements, credit reports, and/or other information. The time spent dealing with the incidents resulting from the Data Breach is time Plaintiff Koester otherwise

would have spent on other activities, such as work and/or recreation. Plaintiff Koester may have to take additional time-consuming, necessary steps to help mitigate the harm caused by the Data Breach, including continually reviewing accounts for any unauthorized activity.

117. Plaintiff Koester places significant value in the security of her Private Information and does not readily disclose it. Plaintiff Koester has never knowingly transmitted unencrypted Private Information over the internet or any other unsecured source.

118. Plaintiff Koester reasonably expected that Crossroads would safeguard her Private Information. Plaintiff Koester would not have trusted Crossroads with Private Information, or agreed to have Private Information provided to Crossroads, if Plaintiff Koester knew that the information collected by Crossroads would be at risk. Plaintiff Koester has suffered irreparable damage and has been placed at a heightened risk of fraud or identity theft as a result of the Data Breach.

119. Plaintiff Koester has been and will continue to be at a heightened and substantial risk of future identity theft and its attendant damages for years to come. Such a risk is certainly real and impending, and is not speculative, given the highly sensitive nature of the Private Information compromised by the Data Breach. Indeed, Defendant acknowledged the present and increased risk of future harm Plaintiff Koester, and the Class now face by offering temporary, non-automatic credit monitoring services to Plaintiff Koester and the Class.

120. Knowing that thieves intentionally targeted and stole her Private Information and knowing that her Private Information is in the hands of cybercriminals has caused Plaintiff Koester great anxiety beyond mere worry, which has been compounded by the fact that Defendant has still not fully informed Plaintiff Koester of key details about the Data Breach's occurrence.

121. Plaintiff Koester has a continuing interest in ensuring that her Private Information, which, upon information and belief, remains in the possession of Defendant, is protected, and safeguarded from future data breaches. Absent this Court's intervention, Plaintiff Koester's and Class Members' Private Information will be wholly unprotected and at-risk of future data breaches.

122.    Plaintiff Koester has suffered injuries directly and proximately caused by the Data Breach, including: (i) invasion of privacy; (ii) theft of her valuable Private Information; (iii) the imminent and certain impending injury flowing from anticipated fraud and identity theft posed by her Private Information being placed in the hands of cybercriminals; (iv) damages to and diminution in value of her Private Information that was entrusted to Defendant with the understanding that Defendant would safeguard this information against disclosure; (v) loss of the benefit of the bargain with Defendant to provide adequate and reasonable data security—i.e., the difference in value between what Plaintiff Koester should have received from Defendant and Defendant's defective and deficient performance of that obligation by failing to provide reasonable and adequate data security and failing to protect her Private Information; and (vi) continued risk to her Private Information, which remains in the possession of Defendant and which is subject to further breaches so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information that was entrusted to Defendant.

123.    As a result of the Data Breach, Plaintiff Koester is at a present risk and will continue to be at increased risk of identity theft and fraud for years to come.

***Plaintiff Juanita Medina***

124.    Plaintiff Medina received a Notice Letter in or around March 2025, from Defendant informing her that her highly confidential Private Information was compromised in the Data Breach.

125.    Defendant was in possession of Plaintiff Medina's Private Information before, during, and after the Data Breach.

126.    Believing Crossroads would implement and maintain reasonable data security practices to protect customers' and other affiliated persons' Private Information, Plaintiff Medina provided Crossroads with Private Information, or otherwise had Private Information provided to Crossroads.

127.    Because of the Data Breach, there is no doubt Plaintiff Medina's highly confidential Private Information is in the hands of cybercriminals. Reason being, the Notice of Data Breach Letter from Defendant disclosed that an unauthorized third-party had accessed Defendant's systems. The *modus operandi* of cybercriminals involves stealing Private Information for financial gain. Cybercriminals may use stolen identities to conceal their own true identity or carry out a range of fraudulent activities, from credit card fraud to impersonation. As such, Plaintiff Medina and the Class are at an imminent risk of identity theft and fraud.

128.    Plaintiff Medina has made reasonable efforts to mitigate the impact of the Data Breach.

129.    As a result of the Data Breach, Plaintiff Medina has already expended hours of her time and has suffered loss of productivity from taking time to address and attempt to ameliorate, mitigate, and address the future consequences of the Data Breach. This includes: (i) investigating the Data Breach; (ii) investigating how best to ensure that she is protected from identity theft; and/or (iii) reviewing her account statements, credit reports, and/or other information. The time spent dealing with the incidents resulting from the Data Breach is time Plaintiff Medina otherwise would have spent on other activities, such as work and/or recreation. Plaintiff Medina may have to take additional time-consuming, necessary steps to help mitigate the harm caused by the Data Breach, including continually reviewing accounts for any unauthorized activity.

130.    Plaintiff Medina places significant value in the security of her Private Information and does not readily disclose it. Plaintiff Medina has never knowingly transmitted unencrypted Private Information over the internet or any other unsecured source.

131.    Plaintiff Medina reasonably expected that Crossroads would safeguard her Private Information. Plaintiff Medina would not have trusted Crossroads with Private Information, or agreed to have Private Information provided to Crossroads, if Plaintiff Medina knew that the information collected by Crossroads would be at risk. Plaintiff Medina has suffered irreparable

damage and has been placed at a heightened risk of fraud or identity theft as a result of the Data Breach.

132.    Plaintiff Medina has been and will continue to be at a heightened and substantial risk of future identity theft and its attendant damages for years to come. Such a risk is certainly real and impending, and is not speculative, given the highly sensitive nature of the Private Information compromised by the Data Breach. Indeed, Defendant acknowledged the present and increased risk of future harm Plaintiff Medina, and the Class now face by offering temporary, non-automatic credit monitoring services to Plaintiff Medina and the Class.

133.    Knowing that thieves intentionally targeted and stole her Private Information and knowing that her Private Information is in the hands of cybercriminals has caused Plaintiff Medina great anxiety beyond mere worry, which has been compounded by the fact that Defendant has still not fully informed Plaintiff Medina of key details about the Data Breach's occurrence.

134.    Plaintiff Medina has a continuing interest in ensuring that her Private Information, which, upon information and belief, remains in the possession of Defendant, is protected, and safeguarded from future data breaches. Absent this Court's intervention, Plaintiff Medina's and Class Members' Private Information will be wholly unprotected and at-risk of future data breaches.

135.    Plaintiff Medina has suffered injuries directly and proximately caused by the Data Breach, including: (i) invasion of privacy; (ii) theft of her valuable Private Information; (iii) the imminent and certain impending injury flowing from anticipated fraud and identity theft posed by her Private Information being placed in the hands of cybercriminals; (iv) damages to and diminution in value of her Private Information that was entrusted to Defendant with the understanding that Defendant would safeguard this information against disclosure; (v) loss of the benefit of the bargain with Defendant to provide adequate and reasonable data security—i.e., the difference in value between what Plaintiff Medina should have received from Defendant and Defendant's defective and deficient performance of that obligation by failing to provide reasonable and adequate data security and failing to protect her Private Information; and (vi) continued risk

to her Private Information, which remains in the possession of Defendant and which is subject to further breaches so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information that was entrusted to Defendant.

136.    As a result of the Data Breach, Plaintiff Medina is at a present risk and will continue to be at increased risk of identity theft and fraud for years to come.

***Plaintiff Adrine Akopyan***

137.    Plaintiff Akopyan received a Notice Letter in or around March 2025, from Defendant informing her that her highly confidential Private Information was compromised in the Data Breach.

138.    Defendant was in possession of Plaintiff Akopyan's Private Information before, during, and after the Data Breach.

139.    Believing that Crossroads would implement and maintain reasonable data security practices to protect its customers' and other affiliated persons' Private Information, Plaintiff Akopyan provided Crossroads with her Private Information, or otherwise had Private Information provided to Crossroads.

140.    Because of the Data Breach, there is no doubt Plaintiff Akopyan's highly confidential Private Information is in the hands of cybercriminals. Reason being, the Notice of Data Breach Letter from Defendant disclosed that an unauthorized third party had accessed Defendant's systems. The modus operandi of cybercriminals involves stealing Private Information for financial gain. Cybercriminals may use stolen identities to conceal their own true identity or carry out a range of fraudulent activities, from credit card fraud to impersonation. As such, Plaintiff Akopyan and the Class are at an imminent risk of identity theft and fraud.

141.    Plaintiff Akopyan has made reasonable efforts to mitigate the impact of the Data Breach.

142.    As a result of the Data Breach, Plaintiff Akopyan has already expended hours of her time and has suffered loss of productivity from taking time to address and attempt to

ameliorate, mitigate, and address the future consequences of the Data Breach. This includes: (i) investigating the Data Breach; (ii) investigating how best to ensure that she is protected from identity theft; and/or (iii) reviewing her account statements, credit reports, and/or other information. The time spent dealing with the incidents resulting from the Data Breach is time Plaintiff Akopyan otherwise would have spent on other activities, such as work and/or recreation. Plaintiff Akopyan may have to take additional time-consuming, necessary steps to help mitigate the harm caused by the Data Breach, including continually reviewing accounts for any unauthorized activity.

143.    Plaintiff Akopyan places significant value in the security of her Private Information and does not readily disclose it. Plaintiff Akopyan has never knowingly transmitted unencrypted Private Information over the internet or any other unsecured source.

144.    Plaintiff Akopyan reasonably expected that Crossroads would safeguard her Private Information. Plaintiff Akopyan would not have trusted Crossroads with her Private Information, or agreed to have her Private Information provided to Crossroads, if Plaintiff Akopyan knew that the information collected by Crossroads would be at risk due to Crossroads' deficient data security practices and procedures. Plaintiff Akopyan has suffered irreparable damage and has been placed at a heightened risk of fraud or identity theft as a result of the Data Breach.

145.    Plaintiff Akopyan has been and will continue to be at a heightened and substantial risk of future identity theft and its attendant damages for years to come. Such a risk is certainly real and impending, and is not speculative, given the highly sensitive nature of the Private Information compromised by the Data Breach. Indeed, Defendant acknowledged the present and increased risk of future harm Plaintiff Akopyan and the Class now face by offering temporary, non-automatic credit monitoring services to Plaintiff Akopyan and the Class.

146.    Knowing that thieves intentionally targeted and stole her Private Information and knowing that her Private Information is in the hands of cybercriminals has caused Plaintiff Akopyan great anxiety beyond mere worry, which has been compounded by the fact that

Defendant has still not fully informed Plaintiff Akopyan of key details about the Data Breach's occurrence.

147.    Plaintiff Akopyan has a continuing interest in ensuring that her Private Information, which, upon information and belief, remains in the possession of Defendant, is protected and safeguarded from future data breaches. Absent this Court's intervention, Plaintiff Akopyan's and Class Members' Private Information will be wholly unprotected and at risk of future data breaches.

148.    Plaintiff Akopyan has suffered injuries directly and proximately caused by the Data Breach, including: (i) invasion of privacy; (ii) theft of her valuable Private Information; (iii) the imminent and certain impending injury flowing from anticipated fraud and identity theft posed by her Private Information being placed in the hands of cybercriminals; (iv) damages to and diminution in the value of her Private Information that was entrusted to Defendant with the understanding that Defendant would safeguard this information against disclosure; (v) loss of the benefit of her bargain with Defendant to provide adequate and reasonable data security—i.e., the difference in value between what Plaintiff Akopyan should have received from Defendant and Defendant's defective and deficient performance of that obligation by failing to provide reasonable and adequate data security and failing to protect her Private Information; and (vi) continued risk to her Private Information, which remains in the possession of Defendant and which is subject to further breaches so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information that Plaintiff Akopyan entrusted to Defendant.

149.    As a result of the Data Breach, Plaintiff Akopyan is at a present risk, and will continue to be at increased risk, of identity theft and fraud for years to come.

**_Plaintiff Alisa Smith_**

150.    Plaintiff Smith received a Notice of Data Breach Letter in or around March 2025, from Defendant informing her that her highly confidential Private Information was compromised in the Data Breach.

151.    Defendant was in possession of Plaintiff Smith's Private Information before, during, and after the Data Breach.

152.    Believing Crossroads would implement and maintain reasonable data security practices to protect customers' and other affiliated persons' Private Information, Plaintiff Smith provided Crossroads with Private Information, or otherwise had Private Information provided to Crossroads.

153.    Because of the Data Breach, there is no doubt Plaintiff Smith's highly confidential Private Information is in the hands of cybercriminals. Reason being, the Notice of Data Breach Letter from Defendant disclosed that an unauthorized third-party had accessed Defendant's systems. The *modus operandi* of cybercriminals involves stealing Private Information for financial gain. Cybercriminals may use stolen identities to conceal their own true identity or carry out a range of fraudulent activities, from credit card fraud to impersonation. As such, Plaintiff Smith and the Class are at an imminent risk of identity theft and fraud.

154.    Plaintiff Smith has made reasonable efforts to mitigate the impact of the Data Breach.

155.    As a result of the Data Breach, Plaintiff Smith has already expended hours of her time and has suffered loss of productivity from taking time to address and attempt to ameliorate, mitigate, and address the future consequences of the Data Breach. This includes: (i) investigating the Data Breach; (ii) investigating how best to ensure that she is protected from identity theft; and/or (iii) reviewing her account statements, credit reports, and/or other information. The time spent dealing with the incidents resulting from the Data Breach is time Plaintiff Smith otherwise would have spent on other activities, such as work and/or recreation. Plaintiff Smith may have to take additional time-consuming, necessary steps to help mitigate the harm caused by the Data Breach, including continually reviewing accounts for any unauthorized activity.

156.    Since the Data Breach, Plaintiff Smith has suffered a serious uptick in phishing emails. Receiving phishing emails after a data breach is a common consequence. When a data

breach occurs, attackers often gain access to email addresses and other personal information, which they then use to send out phishing emails designed to steal further data or install malware.

157. Plaintiff Smith places significant value in the security of her Private Information and does not readily disclose it. Plaintiff Smith has never knowingly transmitted unencrypted Private Information over the internet or any other unsecured source.

158. Plaintiff Smith reasonably expected that Crossroads would safeguard her Private Information. Plaintiff Smith would not have trusted Crossroads with Private Information, or agreed to have Private Information provided to Crossroads, if Plaintiff Smith knew that the information collected by Crossroads would be at risk. Plaintiff Smith has suffered irreparable damage and has been placed at a heightened risk of fraud or identity theft as a result of the Data Breach.

159. Plaintiff Smith has been and will continue to be at a heightened and substantial risk of future identity theft and its attendant damages for years to come. Such a risk is certainly real and impending, and is not speculative, given the highly sensitive nature of the Private Information compromised by the Data Breach. Indeed, Defendant acknowledged the present and increased risk of future harm Plaintiff Smith, and the Class now face by offering temporary, non-automatic credit monitoring services to Plaintiff Smith and the Class.

160. Knowing that thieves intentionally targeted and stole her Private Information and knowing that her Private Information is in the hands of cybercriminals has caused Plaintiff Smith great anxiety beyond mere worry, which has been compounded by the fact that Defendant has still not fully informed Plaintiff Smith of key details about the Data Breach's occurrence.

161. Plaintiff Smith has a continuing interest in ensuring that her Private Information, which, upon information and belief, remains in the possession of Defendant, is protected, and safeguarded from future data breaches. Absent this Court's intervention, Plaintiff Smith's and the Class Members' Private Information will be wholly unprotected and at-risk of future data breaches.

162. Plaintiff Smith has suffered injuries directly and proximately caused by the Data Breach, including: (i) invasion of privacy; (ii) theft of her valuable Private Information; (iii) the

imminent and certain impending injury flowing from anticipated fraud and identity theft posed by her Private Information being placed in the hands of cybercriminals; (iv) damages to and diminution in value of her Private Information that was entrusted to Defendant with the understanding that Defendant would safeguard this information against disclosure; (v) loss of the benefit of the bargain with Defendant to provide adequate and reasonable data security—i.e., the difference in value between what Plaintiff Smith should have received from Defendant and Defendant's defective and deficient performance of that obligation by failing to provide reasonable and adequate data security and failing to protect her Private Information; and (vi) continued risk to her Private Information, which remains in the possession of Defendant and which is subject to further breaches so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information that was entrusted to Defendant.

163.     As a result of the Data Breach, Plaintiff Smith is at a present risk and will continue to be at increased risk of identity theft and fraud for years to come.

***Plaintiff Sedre Wright***

164.     Plaintiff Wright received a Notice Letter in or around March 2025, from Defendant informing him that his highly confidential Private Information was compromised in the Data Breach.

165.     Defendant was in possession of Plaintiff Wright's Private Information before, during, and after the Data Breach.

166.     Believing Crossroads would implement and maintain reasonable data security practices to protect customers' and other affiliated persons' Private Information, Plaintiff Wright provided Crossroads with Private Information, or otherwise had Private Information provided to Crossroads.

167.     Because of the Data Breach, there is no doubt Plaintiff Wright's highly confidential Private Information is in the hands of cybercriminals. Reason being, the Notice of Data Breach Letter from Defendant disclosed that an unauthorized third-party had accessed Defendant's

systems. The *modus operandi* of cybercriminals involves stealing Private Information for financial gain. Cybercriminals may use stolen identities to conceal their own true identity or carry out a range of fraudulent activities, from credit card fraud to impersonation. As such, Plaintiff Wright and the Class are at an imminent risk of identity theft and fraud.

168.    Plaintiff Wright has made reasonable efforts to mitigate the impact of the Data Breach.

169.    As a result of the Data Breach, Plaintiff Wright has already expended hours of his time and has suffered loss of productivity from taking time to address and attempt to ameliorate, mitigate, and address the future consequences of the Data Breach. This includes: (i) investigating the Data Breach; (ii) investigating how best to ensure that he is protected from identity theft; and/or (iii) reviewing his account statements, credit reports, and/or other information. The time spent dealing with the incidents resulting from the Data Breach is time Plaintiff Wright otherwise would have spent on other activities, such as work and/or recreation. Plaintiff Wright may have to take additional time-consuming, necessary steps to help mitigate the harm caused by the Data Breach, including continually reviewing accounts for any unauthorized activity.

170.    Plaintiff Wright places significant value in the security of his Private Information and does not readily disclose it. Plaintiff Wright has never knowingly transmitted unencrypted Private Information over the internet or any other unsecured source.

171.    Plaintiff Wright reasonably expected that Crossroads would safeguard his Private Information. Plaintiff Wright would not have trusted Crossroads with Private Information, or agreed to have Private Information provided to Crossroads, if Plaintiff Wright knew that the information collected by Crossroads would be at risk. Plaintiff Wright has suffered irreparable damage and has been placed at a heightened risk of fraud or identity theft as a result of the Data Breach.

172.    Plaintiff Wright has been and will continue to be at a heightened and substantial risk of future identity theft and its attendant damages for years to come. Such a risk is certainly

real and impending, and is not speculative, given the highly sensitive nature of the Private Information compromised by the Data Breach. Indeed, Defendant acknowledged the present and increased risk of future harm Plaintiff Wright, and the Class now face by offering temporary, non-automatic credit monitoring services to Plaintiff Wright and the Class.

173.    Knowing that thieves intentionally targeted and stole his Private Information and knowing that his Private Information is in the hands of cybercriminals has caused Plaintiff Wright great anxiety beyond mere worry, which has been compounded by the fact that Defendant has still not fully informed Plaintiff Wright of key details about the Data Breach's occurrence.

174.    Plaintiff Wright has a continuing interest in ensuring that his Private Information, which, upon information and belief, remains in the possession of Defendant, is protected, and safeguarded from future data breaches. Absent this Court's intervention, Plaintiff Wright's and Class Members' Private Information will be wholly unprotected and at-risk of future data breaches.

175.    Plaintiff Wright has suffered injuries directly and proximately caused by the Data Breach, including: (i) invasion of privacy; (ii) theft of his valuable Private Information; (iii) the imminent and certain impending injury flowing from anticipated fraud and identity theft posed by his Private Information being placed in the hands of cybercriminals; (iv) damages to and diminution in value of his Private Information that was entrusted to Defendant with the understanding that Defendant would safeguard this information against disclosure; (v) loss of the benefit of the bargain with Defendant to provide adequate and reasonable data security—i.e., the difference in value between what Plaintiff Wright should have received from Defendant and Defendant's defective and deficient performance of that obligation by failing to provide reasonable and adequate data security and failing to protect his Private Information; and (vi) continued risk to his Private Information, which remains in the possession of Defendant and which is subject to further breaches so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information that was entrusted to Defendant.

176.    As a result of the Data Breach, Plaintiff Wright is at a present risk and will continue to be at increased risk of identity theft and fraud for years to come.

***Plaintiff LaSean Tardd***

177.    Plaintiff Tardd received a Notice Letter in or around March 2025, from Defendant informing her that her highly confidential Private Information was compromised in the Data Breach.

178.    Defendant was in possession of Plaintiff Tardd's Private Information before, during, and after the Data Breach.

179.    Believing Crossroads would implement and maintain reasonable data security practices to protect customers' and other affiliated persons' Private Information, Plaintiff Tardd provided Crossroads with Private Information, or otherwise had Private Information provided to Crossroads.

180.    Because of the Data Breach, there is no doubt Plaintiff Tardd's highly confidential Private Information is in the hands of cybercriminals. Reason being, the Notice of Data Breach Letter from Defendant disclosed that an unauthorized third-party had accessed Defendant's systems. The *modus operandi* of cybercriminals involves stealing Private Information for financial gain. Cybercriminals may use stolen identities to conceal their own true identity or carry out a range of fraudulent activities, from credit card fraud to impersonation. As such, Plaintiff Tardd and the Class are at an imminent risk of identity theft and fraud.

181.    Plaintiff Tardd has made reasonable efforts to mitigate the impact of the Data Breach.

182.    As a result of the Data Breach, Plaintiff Tardd has already expended hours of her time and has suffered loss of productivity from taking time to address and attempt to ameliorate, mitigate, and address the future consequences of the Data Breach. This includes: (i) investigating the Data Breach; (ii) investigating how best to ensure that she is protected from identity theft; (iii) reviewing her account statements, credit reports, and/or other information; and (iv) signing up for

Defendant's limited credit monitoring services. The time spent dealing with the incidents resulting from the Data Breach is time Plaintiff Tardd otherwise would have spent on other activities, such as work and/or recreation. Plaintiff Tardd may have to take additional time-consuming, necessary steps to help mitigate the harm caused by the Data Breach, including continually reviewing accounts for any unauthorized activity.

183.     Since the Data Breach, Plaintiff Smith has suffered a serious uptick in spam emails, texts, and calls. Receiving spam communications such as this after a data breach is a common consequence. When a data breach occurs, attackers often gain access to email addresses and other personal information, which they then use to send out phishing communications designed to steal further data or install malware.

184.     Plaintiff Tardd places significant value in the security of her Private Information and does not readily disclose it. Plaintiff Tardd has never knowingly transmitted unencrypted Private Information over the internet or any other unsecured source.

185.     Plaintiff Tardd reasonably expected that Crossroads would safeguard her Private Information. Plaintiff Tardd would not have trusted Crossroads with Private Information, or agreed to have Private Information provided to Crossroads, if Plaintiff Tardd knew that the information collected by Crossroads would be at risk. Plaintiff Tardd has suffered irreparable damage and has been placed at a heightened risk of fraud or identity theft as a result of the Data Breach.

186.     Plaintiff Tardd has been and will continue to be at a heightened and substantial risk of future identity theft and its attendant damages for years to come. Such a risk is certainly real and impending, and is not speculative, given the highly sensitive nature of the Private Information compromised by the Data Breach. Indeed, Defendant acknowledged the present and increased risk of future harm Plaintiff Tardd, and the Class now face by offering temporary, non-automatic credit monitoring services to Plaintiff Tardd and the Class.

187.     Knowing that thieves intentionally targeted and stole her Private Information and knowing that her Private Information is in the hands of cybercriminals has caused Plaintiff Tardd

great anxiety beyond mere worry, which has been compounded by the fact that Defendant has still not fully informed Plaintiff Tardd of key details about the Data Breach's occurrence.

188.    Plaintiff Tardd has a continuing interest in ensuring that her Private Information, which, upon information and belief, remains in the possession of Defendant, is protected, and safeguarded from future data breaches. Absent this Court's intervention, Plaintiff Tardd's and the Class Members' Private Information will be wholly unprotected and at-risk of future data breaches.

189.    Plaintiff Tardd has suffered injuries directly and proximately caused by the Data Breach, including: (i) invasion of privacy; (ii) theft of her valuable Private Information; (iii) the imminent and certain impending injury flowing from anticipated fraud and identity theft posed by her Private Information being placed in the hands of cybercriminals; (iv) damages to and diminution in value of her Private Information that was entrusted to Defendant with the understanding that Defendant would safeguard this information against disclosure; (v) loss of the benefit of the bargain with Defendant to provide adequate and reasonable data security—i.e., the difference in value between what Plaintiff Tardd should have received from Defendant and Defendant's defective and deficient performance of that obligation by failing to provide reasonable and adequate data security and failing to protect her Private Information; and (vi) continued risk to her Private Information, which remains in the possession of Defendant and which is subject to further breaches so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information that was entrusted to Defendant.

190.    As a result of the Data Breach, Plaintiff Tardd is at a present risk and will continue to be at increased risk of identity theft and fraud for years to come.

## V.    CLASS ACTION ALLEGATIONS

191.    Plaintiffs bring this class action on behalf of themselves and on behalf of all others similarly situated, pursuant to Fed. R. Civ. P. 23(a), 23(b)(1), 23(b)(2), 23(b)(3), 23(c)(4) and/or 23(c)(5).

192.    The Classes that Plaintiffs seek to represent are defined as follows:

**Nationwide Class**

All individuals residing in the United States whose Private Information was impacted by the Data Breach, including all persons who received notice of the Data Breach.

**California Class**

All individuals residing in California whose Private Information was impacted by the Data Breach, including all persons who received notice of the Data Breach.

193.    Excluded from the Class are Defendant, any entity in which Defendant has a controlling interest, and Defendant's officers, directors, legal representatives, successors, subsidiaries, and assigns. Also excluded from the Class is any judge, justice, or judicial officer presiding over this matter and members of their immediate families and judicial staff.

194.    Plaintiffs reserve the right to amend the above definitions.

195.    **Numerosity:** The proposed Class is so numerous that joinder of all members is impracticable.

196.    **Typicality:** Plaintiffs' claims are typical of the claims of the Class. Plaintiffs and all members of the Class were injured through Crossroads' uniform misconduct. Crossroads' inadequate data security gave rise to Plaintiffs' claims and are identical to those that give rise to the claims of every other Class member because Plaintiffs and each member of the Class had their sensitive Private Information compromised in the same way by the same conduct of Crossroads.

197.    **Adequacy:** Plaintiffs are adequate representatives of the Class because Plaintiffs' interests do not conflict with the interests of the Class; Plaintiffs have retained counsel competent and highly experienced in data breach class action litigation; and Plaintiffs and Plaintiffs' counsel intend to prosecute this action vigorously. The interests of the Class will be fairly and adequately protected by Plaintiffs and their counsel.

198.    **Superiority:** A class action is superior to other available means of fair and efficient adjudication of the claims of Plaintiffs and the Class. The injury suffered by each individual class member is relatively small in comparison to the burden and expense of individual prosecution of

complex and expensive litigation. It would be very difficult if not impossible for members of the Class individually to effectively redress Crossroads' wrongdoing. Even if Class Members could afford such individual litigation, the court system could not. Individualized litigation presents a potential for inconsistent or contradictory judgments. Individualized litigation increases the delay and expense to all parties, and to the court system, presented by the complex legal and factual issues of the case. By contrast, the class action device presents far fewer management difficulties and provides benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

199.   **Commonality and Predominance:** There are many questions of law and fact common to the claims of Plaintiffs and the other members of the Class, and those questions predominate over any questions that may affect individual members of the Class. Common questions for the Class include:

    a.   Whether Defendant engaged in the wrongful conduct alleged herein;

    b.   Whether Defendant failed to adequately safeguard Private Information;

    c.   Whether Defendant owed a duty to Plaintiffs and the Class to adequately protect their Private Information;

    d.   Whether Crossroads breached its duties to Plaintiffs and the Class, including under the FTC Act, 15 U.S.C § 45 and/or California Consumer Privacy Act, Cal. Civ. Code § 1798.150(a)(1);

    e.   Whether Crossroads failed to provide adequate cybersecurity;

    f.   Whether Crossroads knew or should have known that its computer and network security systems were vulnerable to cyberattacks;

    g.   Whether Crossroads' conduct, including its failure to act, resulted in or was the proximate cause of the breach of its company network;

    h.   Whether Crossroads was negligent in permitting unencrypted Private Information off vast numbers of individuals to be stored within its network;

i.   Whether Crossroads was negligent in failing to adhere to reasonable retention policies, thereby greatly increasing the size of the Data Breaches to include former employees and business associates;

j.   Whether Crossroads breached implied contractual duties to Plaintiffs and the Class to use reasonable care in protecting their Private Information;

k.   Whether Crossroads failed to adequately respond to the Data Breach, including failing to investigate it diligently and notify affected individuals in the most expedient time possible and without unreasonable delay, and whether this caused damages to Plaintiffs and the Class;

l.   Whether Crossroads continues to breach duties to Plaintiffs and the Class;

m.   Whether Crossroads violated California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, *et seq.*;

n.   Whether Crossroads violated California's Consumer Privacy Act, Cal. Civ. Code § 1798.100, *et seq.* ("CCPA");

o.   Whether Plaintiffs and the Class suffered injury as a proximate result of Crossroads' negligent actions or failures to act;

p.   Whether Plaintiffs and the Class are entitled to recover damages, equitable relief, and other relief; and

q.   Whether Crossroads' actions alleged herein constitute gross negligence, and whether Plaintiffs and Class Members are entitled to punitive damages.

## VI.   CAUSES OF ACTION

### COUNT I
### NEGLIGENCE AND NEGLIGENCE *PER SE*
### (On Behalf of Plaintiffs and the Nationwide Class or, alternatively, the California  Class)

200.   Plaintiffs reallege and incorporate by reference each of the above paragraphs as if fully set forth herein.

201.   This count is alleged on behalf of Plaintiffs and the Nationwide Class, or alternatively, the California Class.

202.   Crossroads solicited, gathered, and stored the Private Information of Plaintiffs and Class Members.

203.   Upon accepting and storing the Private Information of Plaintiffs and Class Members on its computer systems and networks, Defendant undertook and owed a duty to Plaintiffs and Class Members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting the Private Information of Plaintiffs and the Class from being compromised, lost, stolen, accessed, and misused by unauthorized persons.

204.   Defendant had full knowledge of the sensitivity of the Private Information and the types of harm that Plaintiffs and Class Members could and would suffer if the Private Information was wrongfully disclosed. Plaintiffs and Class Members were the foreseeable victims of any inadequate safety and security practices. Plaintiffs and the Class Members had no ability to protect their Private Information that was in Defendant's possession. As such, a special relationship existed between Defendant and Plaintiffs and the Class.

205.   Because of this special relationship, Defendant required Plaintiffs and Class Members to provide their Private Information, including names, Social Security numbers, and other Private Information.

206.   Implied in these exchanges was a promise by Defendant to ensure that the Private Information of Plaintiffs and Class Members in its possession was only used for the provided purpose and that Defendant would destroy any Private Information that it was not required to maintain.

207.   As part of this special relationship, Defendant had a duty to perform with skill, care, and reasonable expedience and faithfulness.

208.   Defendant owed Plaintiffs and the Class Members a common law duty to use reasonable care to avoid causing foreseeable risk of harm to Plaintiffs and the Class when

obtaining, storing, using, and managing personal information, including taking action to reasonably safeguard or delete such data and providing notification to Plaintiffs and the Class Members of any breach in a timely manner so that appropriate action could be taken to minimize losses.

209.    Defendant's duty extended to protecting Plaintiffs and the Class from the risk of foreseeable criminal conduct of third parties, which has been recognized in situations where the actor's own conduct or misconduct exposes another to the risk or defeats protections put in place to guard against the risk, or where the parties are in a special relationship. *See* Restatement (Second) of Torts § 302B.

210.    Defendant had duties to protect and safeguard the Private Information of Plaintiffs and the Class from being vulnerable to cyberattacks by taking common-sense precautions when dealing with sensitive PII. Additional duties that Defendant owed Plaintiffs, and the Class include:

a.    To exercise reasonable care in designing, implementing, maintaining, monitoring, and testing Defendant's networks, systems, protocols, policies, procedures, and practices to ensure that Plaintiffs' and Class Members' Private Information was adequately secured from impermissible release, disclosure, and publication;

b.    To protect Plaintiffs' and Class Members' Private Information in its possession by using reasonable and adequate security procedures and systems;

c.    To implement processes to quickly detect a data breach, security incident, or intrusion involving its networks and servers; and

d.    To promptly notify Plaintiffs and Class Members of any data breach, security incident, or intrusion that affected or may have affected their Private Information.

211.    Plaintiffs and the Class were the intended beneficiaries of Defendant's duties, creating a special relationship between them and Defendant. Defendant was in a position to ensure that its systems were sufficient to protect the Private Information that Plaintiffs and the Class had entrusted to it.

212.  Plaintiffs' injuries and damages, as described herein, are a reasonably certain consequence of Defendant's negligence and breach of its duties.

213.  Defendant breached its duties of care by failing to adequately protect Plaintiffs' and Class Members' Private Information. Defendant breached its duties by, among other things:

a.    Failing to exercise reasonable care in obtaining, retaining securing, safeguarding, and protecting the Private Information in its possession;

b.    Failing to protect the Private Information in its possession using reasonable and adequate security procedures and systems;

c.    Failing to adequately monitor the security of their networks and system;

d.    Failing to consistently enforce security policies aimed at protecting Private Information;

e.    Failing to implement processes to quickly detect data breaches, security incidents, or intrusions;

f.    Allowing unauthorized access to Class Members' Private Information;

g.    Failing to remove PII it was no longer required to retain pursuant to regulations; and

h.    Failing to promptly notify Plaintiffs and Class Members of the Data Breaches that affected their Private Information.

214.  Defendant breached its duties to Plaintiffs and Class Members under the FTC Act, and the CCPA, Cal. Civ. Code §§ 1798.100, *et seq.*, Cal. Civ. Code §§ 1798.80, *et seq.*, among other statutes, by failing to provide fair, reasonable, or adequate data security in connection with the sale of lending products and services in order to safeguard Plaintiffs' and Class Members' Private Information.

215.  Pursuant to the FTC Act, 15 U.S.C. § 45(a), Defendant had a duty to Plaintiffs and the Class to provide fair and adequate computer systems and data security to safeguard the Private Information of Plaintiffs and the Class.

216. The FTC Act prohibits "unfair practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Defendant, of failing to use reasonable measures to protect PII. The FTC publications and orders described above also formed part of the basis of Defendant's duty in this regard.

217. Pursuant to the CCPA, Cal. Civ. Code Section 1798.150(a)(1), Defendant has a "duty to implement and maintain reasonable security procedures and practices appropriate to the nature of the information to protect the personal information."

218. Defendant gathered and stored the Private Information of Plaintiffs and the Class as part of its business which affects commerce.

219. Defendant violated the FTC Act and the CCPA by failing to use reasonable measures to protect the Private Information of Plaintiffs and the Class and by not complying with applicable industry standards, as described herein.

220. Defendant breached its duties to Plaintiffs and the Class under the FTC Act and CCPA by failing to provide fair, reasonable, or adequate computer systems and/or data security practices to safeguard Plaintiffs' and Class Members' Private Information, and by failing to provide prompt notice without reasonable delay.

221. Defendant's multiple failures to comply with applicable laws and regulations constitutes negligence per se.

222. Plaintiffs and the Class Members are within the class of persons that the FTC Act and the CCPA are intended to protect.

223. The harm that occurred because of the Data Breach is the type of harm the FTC Act and CCPA are intended to guard against.

224. Defendant's willful failure to abide by these duties was wrongful, reckless, and grossly negligent considering the foreseeable risks and known threats.

225. Defendant was aware of the fact that cybercriminals routinely target large corporations through cyberattacks in an attempt to steal customer and employee Private

1    Information. In other words, Defendant knew of a foreseeable risk to its data security systems but

2    failed to implement reasonable security measures.

3    226.    As a direct and proximate result of Defendant's negligent conduct, including but

4    not limited to its failure to implement and maintain reasonable data security practices and

5    procedures as described above, Plaintiffs and the Class have suffered damages and are at imminent

6    risk of additional harms and damages (as alleged above).

7    227.    Further, through its failure to provide timely and clear notification of the Data

8    Breach to Plaintiffs and Class Members, Defendant prevented Plaintiffs and Class Members from

9    taking meaningful, proactive steps to securing their Private Information and mitigating damages.

10    228.    Plaintiffs and Class Members could have taken actions earlier had they been timely

11    notified of the Data Breach, rather than months after it occurred.

12    229.    Plaintiffs and Class Members could have enrolled in credit monitoring, could have

13    instituted credit freezes, and could have changed their passwords, among other things, had they

14    been alerted to the Data Breach more quickly.

15    230.    Plaintiffs and Class Members have suffered harm from the delay in notifying them

16    of the Data Breach.

17    231.    As a direct and proximate cause of Defendant's conduct, including but not limited

18    to its failure to implement and maintain reasonable security practices and procedures, Plaintiffs

19    and Class Members have suffered, as Plaintiffs have, and/or will suffer injury and damages,

20    including but not limited to: (i) the loss of the opportunity to determine for themselves how their

21    Private Information is used; (ii) the publication and/or theft of their Private Information; (iii) out-

22    of-pocket expenses associated with the prevention, detection, and recovery from identity theft, tax

23    fraud, and/or unauthorized use of their Private Information, including the need for substantial

24    credit monitoring and identity protection services for an extended period of time; (iv) lost

25    opportunity costs associated with effort expended and the loss of productivity addressing and

26    attempting to mitigate the actual and future consequences of the Data Breaches, including but not

27

28

limited to efforts spent researching how to prevent, detect, contest and recover from tax fraud and identity theft; (v) costs associated with placing freezes on credit reports and password protections; (vi) anxiety, emotional distress, loss of privacy, and other economic and non-economic losses; (vii) the continued risk to their Private Information, which remains in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information of employees in its continued possession; and, (viii) future costs in terms of time, effort and money that will be expended to prevent, detect, contest, and repair the inevitable and continuing consequences of compromised Private Information for the rest of their lives. Thus, Plaintiffs and the Class are entitled to damages in an amount to be proven at trial.

232.     The damages Plaintiffs and the Class have suffered (as alleged above) and will suffer were and are the direct and proximate result of Defendant's negligent conduct. Plaintiffs and the Class have suffered injury and are entitled to actual and punitive damages in an amount to be proven at trial.

**COUNT II**
**BREACH OF IMPLIED CONTRACT**
**(On Behalf of Plaintiffs and the Nationwide Class or, alternatively, the California Class)**

233.     Plaintiffs reallege and incorporate by reference each of the above paragraphs as if fully set forth herein.

234.     This Count is alleged on behalf of Plaintiffs and the Nationwide Class, or alternatively, the California Class.

235.     Plaintiffs and Class Members formed an implied contract with Defendant regarding the provision of Defendant's services and through transacting business with it, including by Plaintiffs and Class Members providing their Private Information to Defendant in exchange for the services offered.

236.     Defendant solicited, offered, and invited Class Members to provide their Private Information as part of Defendant's regular business practices. Plaintiffs and Class Members

accepted Defendant's offers and provided their Private Information to Defendant as consideration, relying on Defendant to securely maintain and store their Private Information in return for, and in connection with, Defendant's services.

237. Defendant accepted possession of Plaintiffs' and Class Members' Private Information for the purpose of providing services to Plaintiffs and Class Members.

238. Plaintiffs and the Class entrusted their Private Information to Defendant. In so doing, Plaintiffs and the Class entered into implied contracts with Defendant by which Defendant agreed to safeguard and protect such information, to keep such information secure and confidential, and to timely and accurately notify Plaintiffs and the Class if their data had been breached and compromised or stolen.

239. In entering into such implied contracts, Plaintiffs and Class Members reasonably believed and expected that Defendant's data security practices complied with relevant laws and regulations (including FTC guidelines on data security) and were consistent with industry standards.

240. Implicit in the agreement between Plaintiffs and Class Members and the Defendant to provide Private Information, was the latter's obligation to: (a) use such Private Information for business purposes only, (b) take reasonable steps to safeguard that Private Information, (c) prevent unauthorized disclosures of the Private Information, (d) provide Plaintiffs and Class Members with prompt and sufficient notice of any and all unauthorized access and/or theft of their Private Information, (e) reasonably safeguard and protect the Private Information of Plaintiffs and Class Members from unauthorized disclosure or uses, (f) retain the Private Information only under conditions that kept such information secure and confidential.

241. Defendant knew or should have known that it needed to protect Plaintiffs' and Class Members' confidential Private Information in accordance with its own policies, practices, and applicable state and federal law.

242.    The mutual understanding and intent of Plaintiffs and Class Members on the one hand, and Defendant, on the other, is demonstrated by their conduct and course of dealing.

243.    On information and belief, at all relevant times Defendant promulgated, adopted, and implemented written privacy policies whereby it expressly promised Plaintiffs and Class Members that it would only disclose Private Information under certain circumstances, none of which relate to the Data Breach.

244.    On information and belief, Defendant further promised to comply with industry standards and to make sure that Plaintiffs' and Class Members' Private Information would remain protected.

245.    Plaintiffs and Class Members paid money to Defendant with the reasonable belief and expectation that Defendant would use part of its earnings to obtain adequate data security. Defendant failed to do so.

246.    Plaintiffs and Class Members would not have entrusted their Private Information to Defendant in the absence of the implied contract between them and Defendant to keep their information reasonably secure.

247.    Plaintiffs and Class Members fully and adequately performed their obligations under the implied contracts with Defendant.

248.    Defendant breached the implied contracts it made with Plaintiffs and the Class by failing to safeguard and protect their Private Information, by failing to delete the information of Plaintiffs the Class once the relationship ended, and by failing to provide accurate notice to them that Private was compromised because of the Data Breach.

249.    As a direct and proximate result of Defendant's breach of the implied contracts, Plaintiffs and Class Members sustained damages, including, but not limited to: (i) invasion of privacy; (ii) theft of their Private Information; (iii) lost or diminished value of Private Information; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) lost opportunity costs associated with

attempting to mitigate the actual consequences of the Data Breach; (vii) experiencing an increase in spam calls, texts, and/or emails; (viii) statutory damages; (ix) nominal damages; and (x) the continued and certainly increased risk to their Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information.

250.    Plaintiffs and Class Members are entitled to compensatory, consequential, and nominal damages suffered because of the Data Breach.

251.    Plaintiffs and Class Members are also entitled to injunctive relief requiring Defendant to, e.g., (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) immediately provide adequate credit monitoring to all Class Members.

## COUNT III
### VIOLATION OF THE CALIFORNIA UNFAIR COMPETITION LAW
### Cal. Bus. & Prof. Code § 17200 *et seq.* ("UCL")
### (On Behalf of the California Plaintiffs and the California Class)

252.    Plaintiffs reallege and incorporate by reference each of the above paragraphs as if fully set forth herein.

253.    Plaintiffs Koester, Medina, Smith, and Wright ("Plaintiffs" for purposes of this section) bring this claim individually and on behalf of the California Class.

254.    Defendant is a "person" defined by Cal. Bus. & Prof. Code § 17201.

255.    The California Unfair Competition Law, Cal. Bus. & Prof. Code §17200, et seq. ("UCL"), prohibits any "unlawful," "fraudulent" or "unfair" business act or practice and any false or misleading advertising, as defined by the UCL and relevant case law.

256.    By reason of Defendant's above-described wrongful actions, inactions, and omissions, the resulting Data Breach, and the unauthorized disclosure of Plaintiffs' and Class Members' Private Information, Defendant engaged in unfair and unlawful business practices in violation of the UCL.

257.    The acts, omissions, and conduct complained of herein in violation of the UCL were designed and emanated from Defendant's California corporate office.

258.    Plaintiffs suffered injury in fact and lost money or property as a result of Defendant's alleged violations of the UCL.

259.    The acts, omissions, and conduct of Defendant as alleged herein constitute a "business practice" within the meaning of the UCL.

**Unlawful Prong**

260.    Defendant violated the unlawful prong of the UCL by violating, *inter alia*, the CCPA and FTC Act as alleged herein.

261.    Defendant violated the unlawful prong of the UCL by failing to honor the terms of its implied contracts with Plaintiffs and Class Members, as alleged herein.

262.    Defendant's conduct also undermines California public policy—as reflected in statutes like the California Information Practices Act, Cal. Civ. Code §§ 1798, et seq., the CCPA concerning consumer privacy, and the CCRA concerning customer records—which seek to protect customer and consumer data and ensure that entities who solicit or are entrusted with personal data utilize reasonable security measures.

**Unfair Prong**

263.    Defendant's acts, omissions, and conduct also violate the unfair prong of the UCL because Defendant's acts, omissions, and conduct, as alleged herein, offended public policy and constitute immoral, unethical, oppressive, and unscrupulous activities that caused substantial injury, including to Plaintiffs and other Class Members. The gravity of Defendant's conduct outweighs any potential benefits attributable to such conduct and there were reasonably available alternatives to further Defendant's legitimate business interests, other than Defendant's conduct described herein.

264.    Defendant's failure to utilize, and to disclose that it does not utilize, industry standard security practices, constitutes an unfair business practice under the UCL. Defendant's

conduct is unethical, unscrupulous, and substantially injurious to the Class. While Defendant's competitors have spent the time and money necessary to appropriately safeguard their products, service, and customer information, Defendant has not—to the detriment of its customers and to competition.

265.    As a result of Defendant's violations of the UCL, Plaintiffs and Class Members are entitled to injunctive relief including, but not limited to:

a.    ordering that Defendant utilize strong industry standard data security measures for the collection, storage, and retention of customer data;

b.    ordering that Defendant, consistent with industry standard practices, engage third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Defendant's systems on a periodic basis;

c.    ordering that Defendant engage third-party security auditors and internal personnel, consistent with industry standard practices, to run automated security monitoring;

d.    ordering that Defendant audit, test, and train its security personnel regarding any new or modified procedures;

e.    ordering that Defendant, consistent with industry standard practices, segment consumer data by, among other things, creating firewalls and access controls so that if one area of Defendant's systems are compromised, hackers cannot gain access to other portions of those systems;

f.    ordering that Defendant purge, delete, and destroy in a reasonably secure manner Class member data not necessary for its provisions of services;

g.    ordering that Defendant, consistent with industry standard practices, conduct regular database scanning and security checks;

h.    ordering that Defendant, consistent with industry standard practices, evaluate all software, systems, or programs utilized for collection and storage of sensitive Private Information for vulnerabilities to prevent threats to customers;

i.    ordering that Defendant, consistent with industry standard practices, periodically conduct internal training and education to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach; and

j.    ordering Defendant to meaningfully educate its customers about the threats they face as a result of the loss of their Private Information.

266.    As a result of Defendant's violations of the UCL, Plaintiffs and Class Members have suffered injury in fact and lost money or property, as detailed herein. They agreed to transact with Defendant or made purchases or spent money that they otherwise would not have made or spent, had they known the true state of affairs regarding Defendant's data security policies. Class Members lost control over their Private Information and suffered a corresponding diminution in value of that Private Information, which is a property right. Class Members lost money as a result of dealing with the fallout of, and attempting to mitigate harm arising from, the Data Breach.

267.    Plaintiffs request that the Court issue sufficient equitable relief to restore Class Members to the position they would have been in had Defendant not engaged in violations of the UCL, including by ordering restitution of all funds that Defendant may have acquired from Plaintiffs and Class Members as a result of those violations. Plaintiffs further request that the Court issue an injunction requiring Defendant to strengthen its data security practices as outlined herein.

## COUNT IV
## VIOLATION OF THE CALIFORNIA CONSUMER PRIVACY ACT
### Cal. Civ. Code § 1798.100 *et seq.*, § 1798.150(a) ("CCPA")
### (On Behalf of the California Plaintiffs and the California Class)

268.    Plaintiffs reallege and incorporate by reference each of the above paragraphs as if fully set forth herein.

269.    Plaintiffs Koester, Medina, Smith, Akopyan, and Wright ("Plaintiffs" for purposes of this section) bring this claim individually and on behalf of the California Class.

270.    The CCPA, Cal. Civ. Code § 1798.150(a), creates a private cause of action for violations of the CCPA. Section 1798.150(a) specifically provides:

> Any consumer whose nonencrypted and nonredacted personal information, as defined in subparagraph (A) of paragraph (1) of subdivision (d) of Section 1798.81.5, is subject to an unauthorized access and exfiltration, theft, or disclosure as a result of the business's violation of the duty to implement and maintain reasonable security procedures and practices appropriate to the nature of the information to protect the personal information may institute a civil action for any of the following:
>
> (A) To recover damages in an amount not less than one hundred dollars ($100) and not greater than seven hundred and fifty ($750) per consumer per incident or actual damages, whichever is greater.
>
> (B) Injunctive or declaratory relief.
>
> (C) Any other relief the court deems proper.

271.    Defendant is a "business" under § 1798.140(b) in that it is a corporation organized for profit or financial benefit of its shareholders or other owners, with gross revenue in excess of $25 million.

272.    Plaintiffs and Class Members are covered "consumers" under § 1798.140(g) in that they are natural persons who are California residents.

273.    The Private Information of Plaintiffs and the Class Members at issue in this lawsuit constitutes "personal information" under § 1798.150(a) and 1798.81.5, in that the personal information Defendant collects and which was impacted by the cybersecurity attack includes an individual's first name or first initial and the individual's last name in combination with one or more of the following data elements, with either the name or the data elements not encrypted or redacted: (i) Social Security number; (ii) Driver's license number, California identification card number, tax identification number, passport number, military identification number, or other unique identification number issued on a government document commonly used to verify the identity of a specific individual; (iii) account number or credit or debit card number, in combination with any required security code, access code, or password that would permit access to an

individual's financial account; (iv) medical information; (v) health insurance information; (vi) unique biometric data generated from measurements or technical analysis of human body characteristics, such as a fingerprint, retina, or iris image, used to authenticate a specific individual.

274.    Defendant knew or should have known that its computer systems and data security practices were inadequate to safeguard the Class Members' Personal Information and that the risk of a data breach or theft was highly likely. Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature of the information to protect the Personal Information of Plaintiffs and the Class Members. Specifically, Defendant subjected Plaintiffs' and the Class Members' nonencrypted and nonredacted personal information to an unauthorized access and exfiltration, theft, or disclosure as a result of the Defendant's violation of the duty to implement and maintain reasonable security procedures and practices appropriate to the nature of the information, as described herein.

275.    As a direct and proximate result of Defendant's violation of its duty, the unauthorized access and exfiltration, theft, or disclosure of Plaintiffs' and Class Members' personal information included exfiltration, theft, or disclosure through Defendant's servers, systems, and website, and/or the dark web, where hackers further disclosed the personal identifying information alleged herein.

276.    As a direct and proximate result of Defendant's acts, Plaintiffs and the Class Members were injured and lost money or property, including but not limited to the loss of Plaintiffs' and Class Members' legally protected interest in the confidentiality and privacy of their personal information, stress, fear, and anxiety, nominal damages, and additional losses described above.

277.    Section 1798.150(b) specifically provides that "[n]o [prefiling] notice shall be required prior to an individual consumer initiating an action solely for actual pecuniary damages."

278.    Nonetheless, pursuant to California Civil Code § 1798.150(b), Plaintiffs mailed CCPA notice letters to Defendant, detailing the specific provisions of the CCPA that Defendant

has violated and continues to violate. Plaintiff Akopyan mailed a CCPA notice letter to Defendant on April 2, 2025; Plaintiff Wright mailed a CCPA notice letter to Defendant on April 4, 2025; Plaintiff Koester mailed a CCPA notice letter to Defendant on April 7, 2025; and Plaintiffs Smith and Medina mailed a CCPA notice letter to Defendant on July 14, 2025. Defendant did not cure after receiving Plaintiff Wright's, Akopyan's, and Koester's CCPA notice letters within 30 days— and Plaintiffs believe such cure is not possible under these facts and circumstances.

279. Accordingly, Plaintiffs and the Class Members seek actual pecuniary damages suffered as a result of Defendant's violations described herein, as well as all other relief available under the CCPA.

**COUNT V**
**DECLARATORY AND INJUNCTIVE RELIEF**
**(On Behalf of Plaintiffs and the Nationwide Class)**

280. Plaintiffs reallege and incorporate by reference each of the above paragraphs as if fully set forth herein.

281. This count is brought under the Federal Declaratory Judgment Act, 28 U.S.C. § 2201.

282. As previously alleged, Plaintiffs and members of the Class are entered into implied contracts with Defendant, which contracts required Defendant to provide adequate security for the Private Information collected from Plaintiffs and the Class.

283. Defendant owed and still owes a duty of care to Plaintiffs and Class Members that require it to adequately secure Plaintiffs' and Class Members' Private Information.

284. Upon information and belief, Defendant still possesses the Private Information of Plaintiffs and the Class Members.

285. Defendant has not satisfied its contractual obligations and legal duties to Plaintiffs and the Class Members.

286. Since the Data Breach, Defendant has not yet announced any changes to its data security infrastructure, processes, or procedures to fix the vulnerabilities in its computer systems

1    and/or security practices which permitted the Data Breach to occur and go undetected and, thereby,
2    prevent further attacks.

3        287.    Defendant has not satisfied its contractual obligations and legal duties to Plaintiffs
4    and the Class. In fact, now that Defendant's insufficient data security is known to hackers, the
5    Private Information in Defendant's possession is even more vulnerable to cyberattack.

6        288.    Actual harm has arisen in the wake of the Data Breach regarding Defendant's
7    contractual obligations and duties of care to provide security measures to Plaintiffs and the
8    members of the Class. Further, Plaintiffs and the members of the Class are at risk of additional or
9    further harm due to the exposure of their Private Information and Defendant's failure to address
10   the security failings that led to such exposure.

11       289.    There is no reason to believe that Defendant's security measures are any more
12   adequate now than they were before the Data Breaches to meet Defendant's contractual obligations
13   and legal duties.

14       290.    Plaintiffs and the Class, therefore, seek a declaration (1) that Defendant's existing
15   security measures do not comply with its contractual obligations and duties of care to provide
16   adequate security, and (2) that to comply with its contractual obligations and duties of care,
17   Defendant must implement and maintain reasonable security measures, including, but not limited
18   to:

19           a.    Ordering that Defendant engage third-party security auditors/penetration
20   testers as well as internal security personnel to conduct testing, including simulated attacks,
21   penetration tests, and audits on Defendant's systems on a periodic basis, and ordering Defendant
22   to promptly correct any problems or issues detected by such third-party security auditors;

23           b.    Ordering that Defendant engage third-party security auditors and internal
24   personnel to run automated security monitoring;

25           c.    Ordering that Defendant audit, test, and train its security personnel
26   regarding any new or modified procedures;

27

28                        CONSOLIDATED CLASS ACTION COMPLAINT

d.      Ordering that Defendant segment employee data by, among other things, creating firewalls and access controls so that if one area of Defendant's systems is compromised, hackers cannot gain access to other portions of Defendant's systems;

e.      Ordering that Defendant purge, delete, and destroy, in a reasonably secure manner, customer data not necessary for their provisions of services;

f.      Ordering that Defendant conduct regular database scanning and security checks; and

g.      Ordering that Defendant routinely and continually conduct internal training and education to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach.

## VII.    <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiffs and the Class pray for judgment against Defendant as follows:

A.      That the Court determines that this action may be maintained as a class action, that Plaintiffs be appointed as Class Representatives, that the undersigned be named as Class Counsel, and that notice of this action be given to Class members;

B.      That the Court enter an order declaring that Defendant's actions, as set forth in this complaint, violate the laws set forth above;

C.      That the Court issue an order:

i.      prohibiting Defendant from engaging in the wrongful acts stated herein (including Defendant's utter failure to provide notice to all affected consumers);

ii.      requiring Defendant to implement adequate security protocols and practices to protect consumers' Private Information consistent with the industry standards, applicable regulations, and federal, state, and/or local laws;

iii.      mandating the proper notice be sent to all affected parties, and posted publicly;

iv.      requiring Defendant to protect all data collected through its account creation

requirements;

v.      requiring Defendant to delete, destroy, and purge the Private Information of Plaintiffs and Class members unless Defendant can provide reasonable justification for the retention and use of such information when weighed against the privacy interests of Plaintiffs and Class members;

vi.      requiring Defendant to implement and maintain a comprehensive security program designed to protect the confidentiality and integrity of Plaintiffs' and Class members' Private Information;

vii.      requiring Defendant to engage independent third-party security auditors and conduct internal security audit and testing, including simulated attacks, penetration tests, and audits on Defendant's systems on a periodic basis;

viii.      requiring Defendant to engage independent third-party security auditors and/or internal personnel to run automated security monitoring;

ix.      requiring Defendant to create the appropriate firewalls, and implement the necessary measures to prevent further disclosure and leak of any additional information;

x.      requiring Defendant to conduct systematic scanning for data breach related issues;

xi.      requiring Defendant to train and test its employees regarding data breach protocols, archiving protocols, and conduct any necessary employee background checks to ensure that only individuals with the appropriate training and access may be allowed to access the Private Information data; and

xii.      requiring all further and just corrective action, consistent with permissible law and pursuant to only those causes of action so permitted.

D.      That the Court award Plaintiffs and the Class damages (both actual damages for economic and non-economic harm and statutory damages) in an amount to be determined at trial;

E.      That the Court issue appropriate equitable and any other relief (including monetary

1    damages, restitution, and/or disgorgement) against Defendant to which Plaintiffs and the Class are

2    entitled, including, but not limited to, restitution and an order requiring Defendant to cooperate

3    and financially support civil and/or criminal asset recovery efforts;

4        F.    That the Court award Plaintiffs and the Class pre- and post-judgment interest

5    (including pursuant to statutory rates of interest set under state law);

6        G.    That the Court award Plaintiffs and the Class their reasonable attorneys' fees and

7    costs of suit;

8        H.    That the Court award treble and/or punitive damages insofar as they are allowed by

9    applicable laws; and

10        I.    That the Court award any and all other such relief as the Court may deem just and

11    proper under the circumstances.

12                    **I.    <u>DEMAND FOR JURY TRIAL</u>**

13        Plaintiffs hereby demand a trial by jury on all appropriate issues raised in this

14    Consolidated Class Action Complaint.

15    Dated: July 14, 2025              Respectfully submitted,

16

17                        By: */s/ John J. Nelson*
                          John J. Nelson (SBN 317598)
18                        **MILBERG COLEMAN BRYSON**
                          **PHILLIPS GROSSMAN, PLLC**
19                        402 W. Broadway, Suite 1760
                          San Diego, CA 92101
20                        Telephone: (858) 209-6941
                          Email: jnelson@milberg.com
21

22                        Theodore W. Maya (SBN 223242)
                          tmaya@ahdootwolfson.com
23                        Alyssa Brown (SBN 301313)
                          abrown@ahdootwolfson.com
24                        **AHDOOT & WOLFSON, PC**
                          2600 W. Olive Ave. Suite 500
25                        Burbank, CA 91505
                          Telephone: (310) 474-9111
26                        Facsimile: (310) 474-8585

27

28

William B. Federman
(*pro hac vice*)
Kennedy M. Brian
(*pro hac vice*)
**FEDERMAN & SHERWOOD**
10205 N. Pennsylvania Ave.
Oklahoma City, OK 73120
T: (405) 235-1560
F: (405) 239-2112
E: wbf@federmanlaw.com
E: kpb@federmanlaw.com

Kristen Lake Cardoso (SBN 338762)
**IKOPELOWITZ OSTROW P.A.**
One West Law Olas Blvd., Suite 500
Fort Lauderdale, Florida 33301
Tel: (954) 332-4200
cardoso@kolawyers.com

Joseph M. Lyon (SBN 351117)
**THE LYON FIRM**
9210 Irvine Center Drive, Suite 200
Irvine, CA 92618
Phone: (513) 381-2333
Fax: (513) 766-9011
*jlyon@thelyonfirm.com*

***Counsel for Plaintiffs and the Proposed Class***

## CERTIFICATE OF SERVICE

I hereby certify that on July 14, 2025, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify the foregoing document is being served today on all counsel of record in this case via transmission of Notice of Electronic Filing generated by CM/ECF.

*/s/ John J. Nelson*
John J. Nelson